

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-16-2009

# USA v. Olhovsky

Precedential or Non-Precedential: Precedential

Docket No. 07-1642

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Olhovsky" (2009). *2009 Decisions.* Paper 1441.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1441

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-1642
_____

UNITED STATES OF AMERICA

v.

NICOLAU OLHOVSKY,
Appellant

_____

On Appeal from Judgments of Conviction and Sentence
in the United States District Court
for the District of New Jersey
District Judge: Hon. Stanley R. Chesler
(Crim. No. 06-cr-00263)

_____

Argued March 26, 2008

Before:  McKEE, RENDELL and TASHIMA,[*] <u>Circuit</u> <u>Judges</u>

(Filed:  April 16, 2009)

Andrea D. Bergman, Esq. (Argued)
Office of Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, NJ 08609

*Attorney for Defendant-Appellant*

Eric H. Jaso, Esq.
Boies, Schiller & Flexner
150 John F. Kennedy Parkway
4th Floor
Short Hills, NJ 07078

George S. Leone, Esq. (Argued)
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

*Attorneys for Plaintiff-Appellee*

---

[*]  Honorable A. Wallace Tashima, Senior Judge of the United States Court of  Appeals for the Ninth Circuit, sitting by designation.

OPINION OF THE COURT

McKEE, *Circuit Judge.*

Nicolau Olhovsky appeals the sentence of six years imprisonment that was imposed after he pled guilty to possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). He argues both that the sentence is unreasonable and that the sentencing court erred as a matter of law in refusing to allow his treating psychologist to testify at the sentencing hearing. For the reasons that follow, we agree. Accordingly, we will remand for resentencing.

## I. Background[1]

---

[1] Given Olhovsky's unique circumstances and their relevance to his challenge to the reasonableness of his sentence, we will set forth his personal characteristics in

Nicolau Olhovsky was born with several birth defects, including a concave chest (pectus excavatum). When he was eight months old, he underwent heart surgery in an attempt to correct defects in his heart and aorta, and he underwent a second operation at age 14 to correct his concave chest.

Olhovsky's parents divorced when he was seven years old. Following the divorce, he and his sister lived with their mother until his arrest in this case. His mother has been permanently disabled as a result of an automobile accident in 1997.

It is uncontested that Olhovsky was awkward and isolated as a child. He was bullied and teased at school because of his slight build and physical limitations. As a result, he spent much of his time alone in his room with a computer. It is also

detail.

4

uncontested that he was so depressed and suicidal at times that he was admitted to a psychiatric facility in 2004, and that he cut himself with a knife at one point.

The events underlying his prosecution for child pornography began in August of 2004 when an undercover law enforcement officer who was investigating internet child pornography logged onto an Internet Relay Chat ("IRC") channel labeled: "#100%PRETEENGIRLSEXPICS." While monitoring that web site, agents learned that Olhovsky was among those using it to trade child pornography. In December of 2004, shortly after Olhovsky turned eighteen, agents searched the home that Olhovsky shared with his mother and sister. During the course of that search, the agents seized Olhovsky's computer and hard drive. Subsequent examination of that hard drive disclosed over 600 images of child pornography, including photographs of prepubescent girls engaging in sexual activity

5

with adult men.

Olhovsky admitted that the hard drive was his and that he collected and traded child pornography through the IRC. He also told the agents that he began viewing and collecting child pornography when he was about fifteen. Olhovsky further admitted setting up a file server and posting an advertisement offering to trade pornographic materials.

Olhovsky was subsequently arrested pursuant to a criminal complaint charging possession of child pornography based on the results of the aforementioned search and statements Olhovsky had made during the course of the search. Thereafter, Olhovsky waived his right to indictment, and pled guilty to possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

Prior to sentencing, Olhovsky participated in mental health counseling arranged by Probation and Pretrial Services.

6

During the almost two years that passed while Olhovsky was awaiting sentencing, he continued in counseling and therapy, including regular meetings with Dr. Howard Silverman, a psychologist specializing in the treatment of sex offenders. Dr. Silverman's psychological services were provided pursuant to his vendor contract with Pretrial Services.

In August 2006, after he had been treating Olhovsky for over a year, and well before Olhovsky was to be sentenced, Dr. Silverman learned that Olhovsky faced up to ten years in prison pursuant to his guilty plea. That prompted Dr. Silverman to write a letter to Pretrial Services expressing his concerns about Olhovsky's potential incarceration. He sent copies of the letter to defense counsel, the prosecutor and the court. In his letter, Dr. Silverman explained: "despite . . . having worked with many Federal Pre-Trial clients in the past, this is the first letter of its kind that I have ever composed." (App. 25.) In that letter, Dr.

7

Silverman stated:[2]

> When Mr. Olhovsky first consulted with me, he was eighteen years of age. He will only be twenty years of age this coming September 14. However, despite his chronological age as an adult, I have always worked with him with the view of his being a notably immature adolescent who is, perhaps, a juvenile sexual offender but should not be viewed as an adult offender. It is important to make note of the fact that there are significant differences between adult and juvenile sexual abusers. Patterns of sexual interest and arousal are developing and not yet fixed in adolescents. Situational and opportunity factors appear more typical in juvenile sexual offenses, rather than the fixed internal cognitive factors often found in adult offenders. Adolescents have less developed sexual knowledge. Protective factors are especially important when dealing with youngsters. In addition, recidivism rates are notably lower with adolescents.

> I would also like to comment upon the motivational aspects that I believe impacted upon Mr. Olhovsky. Some of these motivators include, in his case, loneliness (as an inappropriate and

---

[2] Because this letter is central to the issues raised on appeal, we take the liberty of quoting it at length.

ineffective means of connecting and engaging with others), naïve experimentation (in which [Olhovsky] is likely to not have been fully aware of the antisocial nature of his actions but was motivated primarily to learn about sex and sex-related matters), to gratify sexual needs (which he believed he was incapable of doing with age-appropriate peers) and as one way in which he could establish social competence or mastery due to the interpersonal difficulties he had experienced throughout much of his life.

Upon presenting to me initially, [Olhovsky] indicated an, overall, unhappy childhood marked by not having enough friends, school problems, and a history of being severely bullied and teased. He was extremely fearful of experiencing further teasing, humiliation, and social rejection. Most of his time was spent alone in which he could escape the very sad reality of his life by going into a world of fantasy available to him on the Internet.

Mr. Olhovsky acknowledged a number of behavioral problems in which he included "odd behavior" because he did not see himself as mature as a typical eighteen year old. He also indicated phobic avoidance of people due to the negative experiences he had had.

Emotionally, Mr. Olhovsky indicated not one positive emotion but a long list of negative ones

9

including feeling depressed, anxious, guilty, regretful, hopeless, helpless, lonely and tense. His main fears included "being alone my whole life" and "not being able to support myself."

Mr. Olhovsky described himself as a useless, unattractive, ugly, stupid and lazy individual who also was unable to make decisions, had memory problems and concentration difficulties.

Interpersonally, he reported having few, if any, friends and not being able to maintain relationships. [Olhovsky] reported no significant emotional/romantic relationships and he had no sexual relationships with others. The primary focus of his sexuality had been via the computer. He maintained, however, that his primary sexual fantasies were of age-appropriate females where mutuality was a part of the experience.

I am also very concerned about Mr. Olhovsky's being able to deal with incarceration due to the physical limitations he has. Not only is he very slightly built (and, quite frankly, incapable of physically protecting himself), but he has a history of open-heart surgery and has physical limitations. Not being a medical doctor, I will not, however, comment further about his medical condition.

I would also like to comment upon my view of the progress that Mr. Olhovsky has made since being

in treatment. While he seems to have little, if any, guidance from his mother (who reportedly is quite physically ill herself with a number of emotional problems), or his father (divorced from his mother and with whom he has limited contact), or any substantial support from any other family member he has, with the assistance of Federal Pre-Trial officers and myself, shown signs of growth both inter- and intra-personally. However, Mr. Olhovsky is at the beginning stages of that growth. Rather than being a nineteen (soon to be twenty) year old, he, actually, more impresses me as being a fourteen or fifteen year old who is stumbling toward adulthood. However, he is moving in the right direction. His self-image is improving, his interactional skills are improving, his assertiveness has increased, his communication skills are improving, he has taken risks regarding being with others which has included going down the Jersey Shore and going to concerts, and he continuously expresses the desire for further social contact with age-appropriate peers.

Mr. Olhovsky still makes certain mistakes such as those which resulted in his being currently unemployed. However, these are mistakes not of maliciousness but, rather, immaturity.

While I cannot represent to you that Mr. Olhovsky will never behave inappropriately in the future

(none of us can predict the future with certainty), I do hope that Mr. Olhovsky can be viewed much more as a juvenile rather than adult sexual offender. I do not view him as being a fixated pedophile or incapable or lacking desire in being with age-appropriate consenting females. He has made progress both interpersonally and intrapersonally. If incarcerated, however, whatever progress that he has made will likely be for naught and, if anything, he will just regress terribly. Additionally, as I noted earlier, I do fear for his physical safety.

I hope the above information is of value to you in having a better understanding of my work with Mr. Olhovsky. . . .

(App. 25-27.)

In the course of preparing for sentencing, Olhovsky's counsel spoke with Dr. Silverman after obtaining a court order authorizing limited disclosure of Olhovsky's treatment records. (App. 15.) Defense counsel claimed that Dr. Silverman was initially "amenable" to appearing as a witness at Olhovsky's

12

sentencing.[3]  Although it is not entirely clear what happened

_____

[3] In a "letter brief" submitted to the district court, defense counsel represented that he advised Dr. Silverman, that: "if the records were mitigating for Mr. Olhovsky, we would revisit the issue of Dr. Silverman's testifying at sentencing.  Dr. Silverman was amen[]able to this suggestion." (App. 16.)  On appeal, Olhovsky has also submitted a letter from defense counsel to Dr. Silverman dated November 20, 2006, in which counsel reports the following:

> I also discussed with you the possibility of testifying for Mr. Olhovsky.  Based on your expressed concern about the prospect of Mr. Olhovsky's long incarceration, I remember telling you that I thought your testimony could be beneficial in Mr. Olhovsky's case.  I advised you that I would review the records at your office first and then evaluate the need for your testimony.  My distinct recollection is that you readily agreed to be available for Mr. Olhovsky's sentencing, but explained that the . . . sentencing . . . was not a good date for you because you had to go to a conference on the treatment of sex offenders that week.  I advised you that I would try to move the sentencing date to accommodate your schedule.  You certainly never advised me that you did not wish to testify, that testifying would be a breach of your

13

next, upon learning of Dr. Silverman's intent to testify, it appears that Pretrial Services took the position that Dr. Silverman's vendor contract precluded him from appearing voluntarily on behalf of Olhovsky at sentencing.[4] It is clear that

---

contract with Pretrial Services, or that you would only testify with a subpoena.

(Supp. App. 1-2.) It is not clear if this letter was part of the record below.

[4] The contract between Silverman's agency and the Pretrial Services Office contains a section entitled "Vendor Testimony" which reads as follows:

The vendor shall:

(1) Appear or testify in legal proceedings convened by the federal court or Parole Commission only
    (a) Upon request of the federal court, United States Probation and Pretrial Services Offices, United States Attorney's Offices, or United States Parole Commission, or
    (b) In response to a subpoena.
(2) Provide testimony including but not limited

14

Pretrial Services "asserted that Dr. Silverman's testimony in this case, because it is expected to be favorable to Mr. Olhovsky, would make him a partisan, and that it is improper to have a 'contract court employee' be turned into a partisan in the

to a defendant's/offender's: attendance record; drug test results; general adjustment to program rules; type and dosage of medication; response to treatment; test results; and treatment programs.
(3) Receive reimbursement for subpoenaed testimony through the Department of Justice based on its witness fee and expense schedule.
(4) Receive necessary consent/release forms required under federal, state or local law form the Government.
(5) Not act as an advocate for the defendant/offender in any legal or administrative proceedings (e.g. if an attorney requests a report or opinion on the treatment of a client) unless such action is approved in writing by the Chief US Probation Officer or Chief US Pretrial Services Officer.

(App. 76.)

15

matter." (App. 16.)[5] Accordingly, Pretrial Services contacted the district court and expressed its opposition to having Dr. Silverman testify at sentencing. (*Id.*)

Upon learning of Pretrial Services' position, defense counsel moved to subpoena Dr. Silverman to testify at Olhovsky's sentencing. The court offered the following explanation for denying the motion:

> I have concluded, based upon two factors, that I am not going to permit Dr. Silverman to testify in this matter. One is because it would appear to me that there's an effort, indeed, to have him testify in some manner as an expert, in short, to give a prognosis and opinion about Mr. Olhovsky's future potential risk and so on.
> That is quintessential expert testimony. There is one basic rule, which is generally applied to expert witnesses in both the civil and criminal context, which is one cannot be

---

[5] This explanation of Pretrial Services' position is contained in Olhovsky's letter brief to the district court. The record contains no written statement from Pretrial Services.

16

subpoenaed to give expert testimony, one can only be subpoenaed to give fact testimony. A treating physician can be subpoenaed to give evidence concerning what he or she did, and, indeed, what a diagnosis was, but prognosis is quintessential expert testimony, predicting what's going to happen in the future.

However, quite frankly, my concerns go also to an entirely different issue, which is, I'm not in the least bit satisfied that it would be beneficial to this Court to have live witness testimony. Quite frankly . . . the Court has had dozens upon dozens of sentencings over the years where psychiatric issues have been raised by way of mitigation, and they have been more than adequately presented to the Court through the submission of reports . . . .

I have no objection to Dr. Silverman submitting anything further relating to his opinions about the defendant in a report or otherwise to the Court if he wishes to supplement what he's already given.

To put it bluntly, without setting any precedent for the future, at a minimum, the cat would appear to be out of the bag in this particular case, and nobody would be particularly well served by preventing Dr. Silverman from giving whatever views, at least in a written form, that he chooses to do so.

But, in the exercise of my discretion, at this point I am not inclined to hear live

17

testimony; and number two, I am extremely dubious about whether or not Dr. Silverman could properly be subject to a subpoena to give expert testimony in a case in which he was not retained as an expert.

I will direct all the treatment notes and so on be provided to you. Dr. Silverman can give me anything which he believes is appropriate to supplement his letter, if he wishes to, after you contact him. You can, and, indeed, have been authorized to retain an expert to give further reports which can be based upon, of course, the interviews along with a review of Dr. Silverman's notes, and so on.

\*\*\*

If you were to advise me that Dr. Silverman voluntarily wished to testify in this matter, and so indicated, I would make my own determination about whether or not I thought such testimony would be useful and beneficial to the Court after seeing in full what I had received in written submissions from the parties.

In short, as [the prosecutor] indicated, I have discretion in determining how I'm going to accept and consider mitigating evidence, and at this point, until I see what further information is presented, I cannot make a definitive decision about whether or not I would permit Dr. Silverman to testify if he chose to do so, but I certainly am not going to be authorizing issuing a subpoena to compel Dr. Silverman.

18

(App. at 92-95.)

Defense counsel indicated at this point that Dr. Silverman had already stated his own willingness to testify, and the subpoena was only requested because of the opposition from Pretrial Services. The court responded: "[g]iven this unique situation which is *sui generis*, if he personally wishes to testify, he can testify, and Pretrial Services and I will work it out between us. (App. at 95.)

Dr. Silverman did not appear at the sentencing as it appears that nothing could be "worked out" regarding his testimony. Moreover, it is not at all clear what the court intended to do, or what it expected defense counsel to do to "work out" an arrangement whereby Dr. Silverman would appear at sentencing. Defense counsel did send one last letter to Dr. Silverman after her request for a subpoena was denied. In that letter, she explained that the court had refused a

19

subpoena and she made the following final plea for Dr. Silverman's assistance:

> Notwithstanding the contract between Discovery House and Pretrial Services, I am writing to ask you to voluntarily testify for Mr. Olhovsky. I am sure that you are in a difficult position vis-a-vis Pretrial Services, and I understand that voluntarily testifying on Mr. Olhovsky's behalf may jeopardize the contract between Discovery House and Pretrial and/or Probation. Quite candidly, [a representative of the Pretrial Services Office] has indicated to me that she cannot guarantee that your choice to testify would not jeopardize your contract with either Probation or Pretrial Services.

(Supp. App. 2.) This letter went unanswered.

**B. Materials Submitted to the Court Prior to Sentencing**

Prior to sentencing, Pretrial Services prepared a Presentence Report ("PSR"), pursuant to Fed. R. Crim. P. 32(d). That PSR includes the following reference to a letter from Olhovsky discussing his understanding of his own behavior:

20

When I was a teenager, I usually spent a lot of time on my computer, and I got a lot of emails from people on line. I got an email from someone that had a picture of a child in a sexual pose. I was in high school and I was around 15 or 16 years old. At first, I did not really think about it, but I just kept receiving more and more pictures. I got interested in the pictures out of curiosity. I wasn't really thinking about how children were being abused. I was very lonely and did not spend a lot of time with friends. At school, I was pretty much an outcast, with people making fun of me all the time for no reason. I spent all my time at home and on the computer. I just gradually got more and more curious about the pictures. I downloaded some software to make an IRC or "internet relay chat" that let other people upload and download pictures, too.

I wasn't thinking about a child being abused when I was swapping pictures. I guess I wasn't thinking of it as that "real." I felt sort of detached from the whole thing. Since I was arrested, I have made a turn around - I totally "get it" that it was wrong and I am really sorry about what I did. Dr. Silverman has helped me see why it was so wrong and I feel really bad about the little kids in those pictures. I am embarrassed about what I did. Before this whole thing happened, I wasn't very good at putting myself in other people's shoes. But I can understand that what I do effects other

people much better now.  I am very, very, sorry.

(PSR ¶ 22.)

Defense counsel also submitted a letter brief in advance of sentencing and attached several supportive letters from family and friends, as well as a copy of Dr. Silverman's letter to Pretrial Services and expert reports from two other mental health professionals.  Defense counsel emphasized that psychologists who had seen Olhovsky agreed that he was an "immature, adolescent" at the time of his offenses.[6]  The letter brief also emphasized the progress Olhovsky had made since being in treatment: he had a job, was attending classes at community college, and was spending more time socializing with his peers.

The first of the expert reports defense counsel submitted

---

[6] In fact, the majority of Olhovsky's offense behavior (downloading and trading pictures) occurred while he was under the age of 18.  He was arrested only a few months after his 18th birthday.

was an eleven-page "Forensic Evaluation," authored by Kirk Heilbrun, Ph.D., head of the Department of Psychology at Drexel University. Dr. Heilbrun interviewed Olhovsky at length and administered various tests. Dr. Heilbrun also interviewed Olhovsky's mother, and reviewed the criminal complaint as well as the images seized from Olhovsky's computer.

Dr. Heilbrun's conclusions were very similar to those of Dr. Silverman. In his Forensic Report, Dr. Heilbrun stated:

> It is possible that Mr. Olhovsky's extreme social anxiety put him at risk for obtaining pornography through the internet in several ways. First, given that Mr. Olhovsky feels considerable anxiety during personal interactions with others, he may feel more comfortable with images and relationships that involve some degree of distance and detachment. Second, Mr. Olhovsky's discomfort in social situations may have inclined him to spend more time alone; social isolation may function as a risk factor for him with respect to this kind of pornography. Third, his discomfort with comparably aged peers and own sense of his social inadequacy incline him toward social and sexual interest in younger individuals.

23

(App. 151.)

Dr. Heilbrun reiterated that Olhovsky "presents as a socially anxious and awkward adolescent who appears considerably less mature, socially and sexually, than most individuals his age." (App. 155.) The doctor then explained: "[h]is social and sexual interest in younger adolescent peers and in prepubescent children can be understood somewhat in this context; rather than viewing these attractions as fixed, they may be considered partly a function of adolescent sexual experimentation, being 'drawn' to images of subjects with whom he feels less awkward - both because they are younger, and because they are images on a computer rather than people presenting in person." (*Id.*)

Dr. Heilbrun concluded that Olhovsky:

1. did not experience symptoms that clearly and significantly impaired his capacity to absorb information in the usual way or to exercise the

24

power of reason or impaired his knowledge of the wrongfulness of these criminal acts, although his naiveté and social isolation may have limited even his basic awareness of the illegality of these acts, and

2. did experience immaturity, social awkwardness, and depression that decreased his capacity to conform his conduct to requirements of the law.

(App. at 155-56.)

The defense also submitted a report from Philip H. Witt, Ph.D., who interviewed both Olhovsky and his mother, spoke with Dr. Silverman, and reviewed Dr. Silverman's treatment records, Dr. Heilbrun's evaluation, the PSR and other records. Dr. Witt's examination focused on "[the] risk [Olhovsky] presents for child molestation." (App. 157.)

Dr. Witt's report included the following summary of his telephone consultation with Dr. Silverman:

. . . Dr. Silverman indicated that Mr. Olhovsky has made substantial progress in treatment. It is

25

Dr. Silverman's opinion that Mr. Olhovsky's serious physical problems, including surgeries and hospitalizations, as a child and adolescent have impaired his social development and level of maturity. As a result, Mr. Olhovsky developed social anxiety and isolated himself from others, having been the brunt of teasing and taunting though his adolescence. Dr. Silverman reported that Mr. Olhovsky has done well in psychotherapy. Dr. Silverman believes that Mr. Olhovsky has made significant steps in a positive direction. Mr. Olhovsky now holds a job, and in fact (at Dr. Silverman's insistence) a job in which Mr. Olhovsky interacts considerably with people, as a cashier at Shop Rite. In addition, again with Dr. Silverman's encouragement, Mr. Olhovsky has an age-appropriate girlfriend. . . . Overall, Dr. Silverman is quite satisfied with Mr. Olhovsky's progress and continues to see him as clinically manageable as an outpatient.

(App. 161-62.)

While acknowledging that most clinical assessment tools have been designed for actual child molesters rather than passive viewers of pornography, Dr. Witt nevertheless attempted to assess Olhovsky's risk for future sex offenses:

26

To at least obtain an estimate of his current and recent functioning, I am scoring Mr. Olhovsky on the SONAR, which focuses entirely on this area. On the SONAR, Mr. Olhovsky received a score of -1 point, placing him in this instrument's low risk range (three points or less). On the stable dynamic risk factors, he receives no points. He is in a sexually and emotionally intimate romantic relationship [with an 18-year-old]; he does not associate with negative social influences; he does not presently espouse attitudes that support or condone sex offending; during the past six months, both his general and his sexual self-regulation have been good. On the acute dynamic risk factors, he has one point subtracted for no longer accessing or downloading child pornography on the Internet.

Overall, a score in this instrument's low risk range is found roughly nine times as frequently among nonrecidivists as among recidivists in the standardization sample upon which this instrument was developed.

(App. at 163-64.)

Finally, Dr. Witt opined that (1) Olhovsky's offense was not "a reflection of a broadly antisocial personality and lifestyle"; (2) "the weight of the evidence [shows] that at the

27

present time, [Olhovsky] does not have a pedophilic sexual interest pattern"; and (3) that Olhovsky, "whatever his initial motivations were for viewing such a vast quantity of child pornography (and at the time, those motivations might well have been a sexual interest pattern focused on minors), appears to presently have a sexual interest pattern focused on adults." (App. 164-65.) Dr. Witt agreed that "social anxiety may have led to Mr. Olhovsky's use of child pornography." (App. 165.) Dr. Witt concluded that "clinically, taking all factors into account, Mr. Olhovsky presents as within the limits of risk appropriate for outpatient management." (*Id.*)

In response, the government submitted a three-page expert report prepared by John S. O'Brien II, M.D., J.D, in which Dr. O'Brien offered his "opinion regarding Mr. Olhovsky's diagnosis and potential dangerousness as a sex offender in the future." (App. 188.) Dr. O'Brien reviewed "a

28

printout regarding the items found on Mr. Olhovsky's computer, including his posting in the internet relay chat room pertaining to child pornography; report of psychological evaluation of Nic[]olau Olhovsky, completed by Philip H. Witt, PhD on January 19, 2007; and report of forensic evaluation of Nic[]olau Olhovsky, completed by Kirk Heilbrun, PhD on January 6, 2006." (*Id*.)  However, it appears that Dr. O'Brien never spoke to Olhovsky's treating psychologist, Dr. Silverman, or reviewed his treatment notes, nor did he ever meet or interview Olhovsky or his mother.

Dr. O'Brien noted his "serious concerns regarding Mr. Olhovsky's prediliction for child pornography and propensity for future involvement in either procuring, distributing, and/or collecting child pornographic materials."  (*Id*.) The report concludes:

Based upon my review of the records I remain

29

unconvinced that Mr. Olhovsky no longer has a pedophilic sexual excitation pattern, or even a pedophilic sexual excitation preference. It is my opinion that he warrants a more intensive degree of psychosexual disorder evaluation and a longer period of observation as a condition of his sentence in order to more effectively, appropriately, and thoroughly evaluate his potential psychosexual disorder, determine whether his alleged "gradual transition in his sexual excitation pattern" is more than just a fleeting byproduct of the serious circumstances which currently confront him and the extent to which he does, in fact, pose a future risk to the community as a predatory sexual offender.

(App. 189-90.)

## C. The Sentencing Hearing

At the sentencing hearing, the district court heard testimony from both Dr. Heilbrun and Dr. Witt. Dr. Silverman did not appear, nor did he submit any additional materials to the court. The district court calculated Olhovsky's total offense level pursuant to the advisory United States Sentencing

Commission Guidelines as 33.[7] That offense level, combined

with his lack of any criminal history, resulted in a Guideline

range of 135 to 168 months imprisonment. However, Olhovsky

was subject to a statutory maximum sentence of 10 years

pursuant to 18 U.S.C. § 2252A(a)(5)(B).[8]  Accordingly, the

Guideline recommendation was 120 months.  Nevertheless, the

court imposed a sentence of six years imprisonment and offered

---

[7] We need not discuss the Guideline calculations in detail because Olhovsky does not challenge the offense level or criminal history category as calculated by the district court.

[8] 18 U.S.C. § 2252A(a)(5)(B), establishes a maximum sentence of 10 years imprisonment for any person who: "knowingly possesses, or . . . accesses with intent to view, any . . . computer disk, or any other material that contains an image of child pornography that has been . . . transported using any . . . facility of interstate or foreign commerce . . . any means, including by computer, . . . " unless the person has a prior conviction for such conduct, in which case a sentence of imprisonment of "not less than 10 nor more than 20 years" is mandated.  18 U.S.C. § 2252A(b)(2).

31

the following explanation:

> The guidelines [] have been issued [] for a reason. Sex child pornography has become more and more recognized as a serious threat to society. It's compounded by the anonymity in which individuals can access child pornography on the Internet and feel insulated. Every one of those downloads represents sexual abuse. The pictures which were handed up to the Court essentially represent in some manner or other the rape of little children, and every individual who seeks to access this material on the Internet has aided and abetted in that activity.

> \*\*\*

> Every one of these postings [on the Internet] can only be regarded as a request by Mr. Olhovsky for someone to produce material or obtain material for him that met this description. . . . This is not a victimless crime. . . .

> So, I'm presented quite frankly with a situation in which Mr. Olhovsky, as the government has indicated, engaged in just extraordinarily extensive conduct in this area. Is he young? He's young. He's young and as the psychologists have admitted, they don't know what he's going to do. He certainly has indicated pedophile proclivities in the past and they can't

32

tell me whether or not he will be a pedophile in the future.

[A]t a minimum this Court has an obligation to make sure that it imposes a sentence which indeed conforms with the provisions of Section 3553 and that includes the need of the sentence imposed to reflect the seriousness of the offense, to promote the law and to provide just punishment and to afford adequate deterrence to criminal conduct, and the problem is this is an incredibly difficult offense to catch and people have to understand that if you are caught, simply because you think you're doing this in the privacy of your own home and that somehow this is not affecting victims, you're wrong. You are affecting victims. You are hurting little children. []

There is only, as far as I'm concerned, one significant mitigating factor in Mr. Olhovsky's favor, his youth. He might stand some chance but, you know something, he also could turn around and become again a predator – a pedophile monster, and this Court is not prepared to impose any sentence which, one, denigrates the significance of the conduct which Mr. Olhovsky has done, suggest that this does not warrant substantial, indeed, potentially draconian punishment and, three, make sure that if he gets treatment, that it's in an environment where

33

indeed it can be ensured that treatment is under close custody, so [] the Court rejects [the defense] arguments for probation. The Court rejects your argument that being treated in a custodial psychiatric facility in the prison system will not help Mr. Olhovsky.

As far as the Court is concerned, it is the best hope that this society has for Mr. Olhovsky given how it *appears that prior efforts have largely failed.* I understand [the defense is] presenting arguments that the past few years have been successful in some manner or other but, quite frankly, the Court is unpersuaded that that is an overwhelming predictor of success; that at a minimum, both incarceration and custodial treatment are required.

(App. 228-231 (emphasis added).)

It is not at all clear what (if any) basis the court had for making the italicized statement. We have discussed the only evidence of treatment that appears on this record, and nothing suggests that "prior efforts have largely failed." In fact, the entire record is to the contrary. The only mental health professionals who actually interviewed, tested or treated

34

Olhovsky concluded that he was quite responsive to treatment. Indeed, not even the government's expert concludes that Olhovsky's treatment has "failed." Rather, Dr. O'Brien concluded that additional observation and therapy was required to determine if Olhovsky's positive response to treatment "is more than just a fleeting byproduct of the serious circumstances which currently confront him and the extent to which he does, in fact, pose a future risk to the community as a predatory sexual offender."

We are similarly troubled by the court's perplexing characterization of defense counsel as arguing that "the past few years have been successful in some manner or other . . . ." That characterization of the evidence before the court is both inaccurate and unfair. It suggests vagaries and generalites (i.e. "successful in some manner or other"), and ignores the very specific evidence of Olhovsky's positive response to treatment.

35

That response includes:  his newfound ability to have an age-appropriate intimate relationship, his employment history and college attendance and the growth in social interaction it both reflects and requires, and his expressions of remorse and the concomitant realization of the harmful nature of his conduct. Although the latter could certainly be feigned in hopes of a more lenient sentence, no one who examined Olhovsky (including the government's own expert) suggested that his positive progress while in treatment, the specific steps he has taken were anything other than an honest reflection of who he was becoming or his introspection and remorse.[9]

At the conclusion of the hearing, the district court sentenced Olhovsky to six years incarceration followed by three

---

[9]As noted, Dr. Silverman described him as a developmental "fourteen or fifteen year old who is stumbling toward adulthood"; but nothing suggests he has done anything but respond positively to treatment.

years of supervised release, with various special conditions. This appeal followed.

## II. Refusal to Subpoena Dr. Silverman.[10]

Olhovsky first argues that the district court erred in refusing to subpoena Dr. Silverman to testify at the sentencing hearing. Olhovsky claims that the district court fundamentally misunderstood its own powers when it concluded that experts could not be subpoenaed to testify. He also argues that Dr. Silverman's absence resulted in significant prejudice. However, it is not clear whether Olhovsky is arguing that the prejudicial error amounts to a violation of due process, an abuse of discretion, or both.

A district court's decision to admit or exclude evidence

---

[10]The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

at sentencing is reviewed for abuse of discretion. *United States v. Cooper*, 437 F.3d 324, 330 n.9 (3d Cir. 2006). However, we review legal conclusions *de novo*. *United States v. Cepero*, 224 F.3d 256, 258 (3d Cir. 2000). *Cf. Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 132-33 (3d Cir. 2004) ("To the extent the district court's admission of evidence was based on an interpretation of the Federal Rules of Evidence, our standard of review is plenary.") (quoting *United States v. Pelullo*, 964 F.2d 193, 199 (3d Cir.1992)).

To its credit, the government does not attempt to defend the district court's conclusion that expert witnesses are not subject to the court's subpoena power. Rather, the government argues that any error was harmless because Dr. Silverman's letter was introduced at sentencing and available to the court. The government also points out that the district court expressly invited defense counsel to have Dr. Silverman appear

38

voluntarily and/or submit supplemental written materials and he did not do so.[11] The government further notes that Olhovsky did submit two reports from other experts who generally agreed with Dr. Silverman's assessments and argues that any further submissions or testimony from Dr. Silverman would merely have been cumulative. Finally, the government emphasizes the sentencing judge's historic discretion in determining what (if any) live testimony to allow at sentencing, and then invites us to assume that even absent any error, the district court would have exercised that discretion and refused to subpoena Dr. Silverman.

However, it is clear that the district court committed legal error in concluding that it could not subpoena Dr. Silverman to testify at Olhovsky's sentencing hearing. As noted earlier, in

---

[11] This argument is a bit puzzling because it was made clear to the district court that Dr. Silverman did not believe he could appear absent a subpoena because of the purported limitations of his contract with Pretrial Services.

39

explaining its refusal to subpoena Dr. Silverman for the sentencing, the court stated "[t]here is one basic rule, which is generally applied to expert witnesses in both the civil and criminal context, which is one cannot be subpoenaed to give expert testimony, one can only be subpoenaed to give fact testimony." (App. 93.) As a threshold matter, we do not think that Silverman would have been testifying as an "expert witness." Rather, he would have testified primarily as a fact witness and informed the court of Olhovsky's attitude and progress in treatment. To the extent that Silverman may have been required to offer an opinion as an expert, we see nothing that precluded him from doing so.

Further, the court's legal basis for that statement is not clear, nor have we been able to independently determine the basis for that "one basic rule." Rule 17 of the Federal Rules of Criminal Procedure governs the issuance of subpoenas in

criminal cases. That rule does not place any limit or qualification on witnesses who may be subpoenaed. Not surprisingly, the government has been unable to direct us to any case that would support the district court's very broad ruling. At oral argument, while not conceding that the district court made an error of law, the government did suggest that perhaps the district court was referring to Fed. R. Civ. P. 45. However, that Rule is not relevant to a criminal proceeding and it would not support the court's ruling even if it did apply.[12]

Moreover, any suggestion that the court's subpoena power is limited in this manner would be inconsistent with the

---

[12] Fed. R. Civ. P. 45 provides that, in a civil case, a court may modify or quash a subpoena "if it requires . . . disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party," or the court may order that the expert be compensated. Fed. R. Civ. P. 45 (c)(3)(B)(ii); Fed. R. Civ. P. 45 (c)(3)(C)(ii).

government's concomitant attempt to rely on the sentencing court's broad discretion to hear witnesses during the sentencing phase. Accordingly, we conclude that the court's determination that it could not allow Dr. Silverman to be subpoenaed for the sentencing hearing was erroneous. The more difficult part of our inquiry is whether Olhovsky was prejudiced by that error since he was able to introduce Dr. Silverman's letter as well as the reports of other behavioral experts. Nevertheless, despite his ability to present that evidence, given the justifiable and stringent concerns of the district court about public safety, the possibility of recidivism, and whether Olhovsky could be a "a pedophile monster," we can not conclude that this error of law was harmless.

> According to our traditional harmless error standard, a non-constitutional error is harmless when "it is highly probable that the error did not prejudice" the defendant. " 'High probability' requires that the court possess a 'sure conviction

that the error did not prejudice' the defendant."

*United States v. Langford*, 516 F.3d 205, 215 (3d Cir. 2008) (citations omitted); *see also United States v. Duckro*, 466 F.3d 438, 446 (6th Cir. 2006) ("[W]here a district court makes a mistake in calculating a guidelines range for purposes of determining a sentence under section 3553(a), we are required to remand for resentencing unless we are certain that any such error was harmless-i.e. any such error did not affect the district court's selection of the sentence imposed.") (citations and internal quotation marks omitted). After reviewing the sentencing transcript we are unable to conclude that it is highly probable that the district court would have imposed the same sentence given an opportunity to discuss its concerns with Dr. Silverman, Olhovsky's treating psychologist. This is particularly true given the extraordinarily favorable nature of other reports by behavioral experts who examined or evaluated

43

Olhovsky.

Dr. Silverman had treated and observed Olhovsky for approximately two years immediately preceding the sentencing. Insofar as can be determined on this record, it appears that Dr. Silverman was responsible for the only behavioral therapy Olhovsky has ever had. As noted above, both the court and the government's expert expressed concerns about Olhovsky's potential for recidivism. As also noted above, the court went so far as to opine that Olhovsky "could turn around and become again a predator – a pedophile monster." Given the severity of that concern and its obvious implication for the safety of society that is part of the inquiry under 18 U.S.C. § 3553(a), we can not conclude that the court would have imposed the same sentence if it had a chance to speak directly with Olhovsky's treating psychologist, pose those concerns and evaluate Dr. Silverman's responses.

Moreover, given the very positive response to treatment that the court either overlooked or ignored, it is difficult for us to see how the court could have continued to view Olhovsky as some kind of "pedophile monster" after addressing those concerns to Dr. Silverman. Such an interaction would have provided an additional basis for the district court to evaluate the favorable and optimistic reports of Drs. Witt and Heilbrun, neither of whom was Olhovsky's treating psychologist.

The district court expressed persistent doubts about Olhovsky's psycho-social prognosis. The court noted: "He's young and as the psychologists have admitted, they don't know what he's going to do. He certainly has indicated pedophile proclivities in the past and they can't tell me whether or not he will be a pedophile in the future." (App. 230.) Obviously, no health care professional can ever give a prognosis with absolute certainty. Everyone's behavior is subject to far too many

45

nuanced subtleties, complexities and uncertainties to allow for any such predictions. Given the concerns that the court expressed at sentencing, and its concerns about this category of offender, we will not ignore the potential force of a conversation with a treating psychologist specializing in the treatment of sex offenders who had been treating Olhovsky for almost two years.

Given our discussion, it should be clear that we are not persuaded that the legal error was cured by the district court's invitation to defense counsel to have Dr. Silverman testify voluntarily. As mentioned above, we are also not convinced that the prejudicial error was mitigated by the court's statement that if Dr. Silverman wished to testify the court would "work it out" with Pretrial Services. (App. 95.) Pretrial Services had taken the position that Dr. Silverman would breach his contract by testifying, and it certainly appears that he could only try to "work things out" if he were willing to risk future employment.

46

In holding that the district court committed prejudicial legal error in refusing to subpoena Dr. Silverman we are mindful of the wide discretion historically afforded sentencing courts. We note however, that although the district court refused to subpoena Dr. Silverman, the court stated: "if he personally wishes to testify, he can testify, . . .".[13] Accordingly, the court did not rule that it would not allow Dr. Silverman to personally address the court. On the contrary, the court stated that it would allow such testimony, but then refused to issue a subpoena which, as we have explained, was the only way the court could

---

[13] As we noted earlier, the Assistant United States Attorney objected to subpoenaing Dr. Silverman by arguing that his testimony would be cumulative given the other expert reports available to the court. However, that is not why the court refused to issue the subpoena. Moreover, it is difficult for us to conceive of how the testimony of the very person most familiar with Olhovsky, and best qualified to answer the court's questions would necessarily be "cumulative."

have had the benefit of that testimony. Whatever Dr. Silverman's personal preferences might have been, the court would not have the benefit of his testimony absent a subpoena because of the resistance of Pretrial Services.

This entire situation is even more perplexing because we can find nothing in Dr. Silverman's contract with Pretrial Services that prohibits someone in Dr. Silverman's position from appearing at sentencing when volunteering to do so and when the defendant does not object. In fact, the contract at issue seems to anticipate this very situation by stating: "[t]he vendor shall . . . [a]ppear or testify in legal proceedings convened by the federal court or Parole Commission only (a) [u]pon request of the federal court, United States Probation and Pretrial Services Offices, United States Attorney's Offices, or United States Parole Commission, or (b) [i]n response to a subpoena." (App. 76).

48

We conclude therefore, that the district court's erroneous denial of defense counsel's request for a subpoena to Olhovsky's treating psychologist was not harmless.[14]

### III. The Reasonableness of the Sentence.

We review the sentence that was imposed to determine if it was reasonable. *See Cooper*, 437 F.3d at 329-30. In doing so, we are guided by the requirement that sentencing courts give "meaningful consideration" to all of the sentencing factors in 18 U.S.C. § 3553(a). *Id.* at 329. Moreover, "the record must show a true, considered exercise of discretion on the part of a district court, including a recognition of, and response to, the parties'

---

[14] We do not suggest that it would be appropriate to issue a subpoena to any mental health professional who works with a criminal defendant. Our holding is confined to the specific facts of this case. The psychologist volunteered to appear and testify, but required a subpoena pursuant to the terms of his contract with a government office, and defense counsel did not object.

non-frivolous arguments." *United States v. Jackson*, 467 F.3d

834, 841 (3d Cir. 2006).

District courts must engage in the following three step

process when determining  an appropriate sentence:

> (1) Courts must continue to calculate a
> defendant's Guidelines sentence precisely as
> they would have before *Booker*.[15]
> (2) In doing so, they must formally rule on the
> motions of both parties and state on the record
> whether they are granting a departure . . . .
> (3) Finally, they are to exercise their discretion
> by considering the relevant § 3553(a)[16] factors

---

[15]*United States v. Booker*, 543 U.S. 220 (2005)

[16] The factors set forth in 18 U.S.C. § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

> in setting the sentence they impose regardless
> whether it varies from the sentence calculated
> under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006)

(citations omitted).  Olhovsky claims that the district court erred

at the third step of this process by failing adequately to consider

all of the § 3553(a) factors and instead unduly emphasized the

need to punish, deter and protect society.

We have explained that sentencing courts must give

"meaningful consideration" to *all* of the statutory factors in 18

---

(4) the kinds of sentence and the sentencing range established for--(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . [that] is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

U.S.C. § 3553(a). *Cooper*, 437 F.3d at 329. It is not enough for a sentencing court to "recit[e] the § 3553(a) factors, say[] that counsel's arguments have been considered, and then declar[e] a sentence." *Jackson*, 467 F.3d at 842. Such a "rote statement" will "not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *Cooper*, 437 F.3d at 329 (citation omitted).

Here, it is not at all apparent that the court actually considered the lengthy, very specific and highly positive reports of any of the three defense experts. Rather, the court focused on incapacitation, deterrence and punishment to the exclusion of other sentencing factors. The court's suggestion that Olhovsky "could turn around and become again a predator – a pedophile monster," and its statement that a sentence must not "denigrate, the significance of the conduct . . . [or suggest that Olhovsky ]

52

does not warrant substantial, indeed, potentially draconian punishment. . . " can not be interpreted in any other way.

While sentencing courts need not discuss each of the § 3553(a) factors "if the record makes clear the court took the factors into account in sentencing," *Cooper*, 437 F.3d at 329, where, as here, the record strongly suggests that some of the statutorily prescribed sentencing factors were ignored, we can not conclude that the resulting sentence was reasonable. Section 3553(a) clearly states that a court must impose a sentence that is "sufficient *but not greater than necessary*, to comply with the purposes of [sentencing]" (emphasis added). This requirement is often referred to as "the parsimony provision," and the Supreme Court has referred to it as the "overarching instruction" of 18 U.S.C. § 3553(a). *See Kimbrough v. United States*, 128 S.Ct. 558, 563 (2007). It has particular relevance to our inquiry here.

The court imposed a custodial sentence that was less than suggested by the Guidelines but still sufficiently lengthy to satisfy the court's conclusion that a "substantial, indeed, potentially draconian" punishment was required. The result is a sentence that appears inconsistent with all of the psychological testimony with the *possible* exception of the expert who testified for the government, Dr. O'Brien. However, Dr. O'Brien's testimony does not negate our conclusion that the district court failed to adequately consider a less retributive or incapacitative sentence for several reasons.

As noted above, Dr. O'Brien's letter expressed his opinion that more evaluation and observation was required in order to determine whether Olhovsky's behavior "is more than just a fleeting byproduct of the serious circumstances and the extent to which he does, in fact, pose a future risk to the community as a predatory sexual offender." Thus, not even Dr.

O'Brien's letter supports a conclusion that a "pedophile monster" lurks inside of Olhovsky. However, even if we assume that the concerns expressed in Dr. O'Brien's letter support a sentence of six years imprisonment, we could still not conclude that the court gave adequate consideration to all of the sentencing factors.

As we explained above, Dr. O'Brien's three-page report was based primarily on the nature of the images on computer rather than any interaction with Olhovsky. O'Brien did not interview Olhovsky or speak to his mother. He did not even bother to speak to the behavioral therapist who had been treating Olhovsky for nearly two years or review that therapist's treatment notes. On the other hand, Dr. Heilbrun and Dr. Witt interviewed Olhovsky as well as his mother before authoring their reports, and Dr. Witt administered psychological tests specifically designed to assess recidivism risks.

55

Moreover, even if the court could somehow conclude that Dr. O'Brien's cautions outweighed the more therapeutically focused recommendations of Drs. Silverman, Heilbrun and Witt, the court never explained why it rejected Dr. Silverman's assessment of the likelihood of recidivism.[17] In fact, as noted earlier, in the face of very specific positive reports of Olhovsky's response to therapy, the court stated that Olhovsky had not been responsive to therapy. The only thing on this record that even tangentially supports that statement is Dr. O'Brien's report. We have already explained why that is simply not adequate to ignore the demand of parsimony that is the

---

[17] Dr. Silverman's letter stated that "recidivism rates are notably lower in adolescents" and that "[s]ituational and opportunity factors" play a larger role in adolescent offenses as opposed to "fixed internal cognitive factors" that motivate adult offenders. The applicability of these generalized observations to Olhovsky is supported by the results of testing administered by Dr. Witt, which placed Olhovsky in the "low risk" category for repeat offenses.

"overarching instruction" of the congressionally mandated sentencing factors. However, there is even more reason to doubt the reasonableness of sentencing Olhovsky to six years in prison.

In the area of disabilities law, we recognize "[t]he treating physician doctrine - a doctrine long accepted by this court." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Pursuant to that doctrine, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Id.*; *see also Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason.") (citation omitted). No less consideration

57

should govern when one's liberty is at stake than when disability benefits hang in the balance.

We have similar concerns over the court's approach to 18 U.S.C. § 3553(a)(2)(D). That provision requires that the court consider the need for any sentence to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Although the district court did mention the obvious need for continued treatment, the court noted only that "if he gets treatment" it should be "in an environment where . . . it can be ensured that [] treatment is under close custody." There is no indication that the district court considered Dr. Silverman's opinion that "[i]f incarcerated . . . he will just regress terribly." Yet, Dr. Silverman's fears about the effect of a lengthy term of imprisonment were sufficient to motivate him to write a letter to the sentencing court; something he had never done before. The

58

court certainly did not have to accept Dr. Silverman's concerns and refrain from incarcerating Olhovsky, but the record must reflect the reason for believing that treatment in prison would "provide . . .correctional treatment in the most effective manner" despite Dr. Silverman's opinion to the contrary.

Moreover, it is exceedingly difficult to review this sentencing transcript without becoming convinced that the district court was so appalled by the offense that it lost sight of the offender. The fact that the record does not reflect the required consideration of "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), is particularly troubling given the professional opinions of the psychologists who treated or interviewed him. Our concern that the court lost sight of the offender is only slightly mitigated by the below Guideline sentence that the court imposed.

We do not suggest that the court acted unreasonably

merely because it rejected defense counsel's request for probation or that the court's concern about this category of offense is misplaced. Offenses involving the sexual exploitation of children foster a market that destroys lives. Therefore, the court was correct in refusing to view Olhovsky's "passive" behavior as a victimless crime. Nevertheless, 18 U.S.C. § 3553(a) applies to all offenders, and Congress requires that courts sentence the *individual offender.* Although the offender's conduct is part of the sentencing equation, it is not the totality of it, and this record does not establish the reasonableness of focusing on the offense at the expense of the individual offender.

As we mentioned earlier, this sentence was below the advisory Guideline range and that range had been lowered to comply with the statutory maximum sentence. However, that does not obviate the necessity of our inquiry into the

60

reasonableness of this sentence. "Regardless of whether the sentence imposed is inside or outside the Guidelines range, [we] must review the sentence under an abuse-of-discretion standard. [We] must first ensure that the district court committed no significant procedural error, such as . . . failing to consider [each of] the § 3553(a) factors . . ." *Gall v. United States*, 128 S. Ct. 586, 597 (2007). For reasons we have already explained, we conclude that the district court did commit a procedural error in imposing this sentence. However, we also conclude that, notwithstanding the Guideline range, the sentence was not substantively reasonable.[18]

We are, of course, acutely aware of the limitations placed on an appellate court reviewing the district court's sentence.

---

[18] *See Gall v. United States*, 128 S.Ct. 586, 597 (2007) (appellate review for procedural error such as "failing to consider the 3553(a) factors" should precede review for substantive reasonableness).

The issue is not whether we would have imposed the same sentence, or even a similar sentence. Rather, the issue is whether the sentence is reasonable in light of this record and the sentencing factors. The suggested Guideline range does not define the parameters of that inquiry. *See Cooper*, 437 F.3d at 332.

Here, the district court imposed a substantial prison term while explaining that it could not predict the future (*i.e.* Olhovsky's likelihood of recidivism) with any certainty and that prior treatment efforts had failed. We have already explained how the latter statement is simply incorrect. The former explanation is of little assistance because no court can ever be absolutely certain that a defendant will not reoffend. Moreover, that rationale would justify an incapacitative sentence for any defendant regardless of criminal history or the success of any therapy because the possibility of recidivism can never be

62

reduced to zero.[19]

Moreover, these expressions by the sentencing court reinforce our concern that the court was so offended by the nature of Olhovsky's conduct that it sentenced the offense at the expense of determining an appropriate sentence for the offender:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Gall*, 128 S. Ct. at 597. Our concern is reinforced by the court's omission of any consideration for Olhovsky's subnormal social development. Drs. Silverman, Witt and Heilbrun all referred to Olhovsky's developmental problems. Indeed, Dr. Silverman stressed that Olhovsky had been quite slow to mature

---

[19]Regrettably, the probability of anyone committing a crime can never be reduced to zero.

and that he was therefore immature even given his chronological age. Yet, it does not appear that the court considered that testimony in sentencing Olhovsky to six years in prison, nor did the court explain why it was rejecting concerns about the impact of a lengthy prison sentence on Olhovsky's chances for continuing healthy social adjustment. In *Gall*, the Court noted the significance of considering immaturity at sentencing. 128 S. Ct. at 601. The Court specifically mentioned that the district court there had stressed Gall's relative immaturity at the time of the offense and had referenced the Court's opinion in *Roper v. Simmons*, 543 US. 551, 569 (2005). In *Roper*, the Court had quoted a study that concluded "lack of maturity and an underdeveloped sense of responsibility are qualities that often result in impetuous and ill-considered actions." *Id.* (internal quotation marks omitted). *Gall* quoted the reasoning of the district court that:

64

> Immaturity at the time of the offense conduct is not an inconsequential consideration. . . [T]he recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Id.* Given Dr. Silverman's letter and concerns that Olhovsky's lack of emotional maturity directly contributed to this offense, the sentencing court should have either explained the extent to which, if any, Olhovsky's immaturity factored into its sentence of six years imprisonment, or explained why it was irrelevant. While the district court did mention Olhovsky's "youth" as a mitigating factor, it is clear that was a reference to Olhovsky's chronological age. Olhovsky was 18 when he was arrested and 20 when sentenced. As noted earlier, Dr. Silverman viewed Olhovsky as a 14 or 15 year old juvenile.

We realize that it could be argued that the court did

65

consider Olhovsky's immaturity and relied in part on that to impose a sentence that was substantially below the Guideline range. However, nothing on this record supports that claim, and any such argument fails to explain why the sentencing court did not address the therapist's concern about the effect of a long prison term on Olhovsky, or his developmental immaturity. Nor is our concern for the substantive reasonableness of the sentence mitigated by the argument that serious crimes like this must necessarily be punished with substantial prison terms in order to preserve respect for the law. In affirming the sentence that the government appealed in *Gall*, the Supreme Court noted that the district court had there observed that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." 128 S. Ct. at 599.

66

That statement has particular significance here. As noted above, the district court did not offer any explanation for accepting the government's three-page expert report and ignoring the substantial evidence derived from the contrary expert opinions of the psychologists who actually interviewed Olhovsky and his mother, or the opinion of his treating psychologist. Instead, the sentencing judge spoke extensively about the insidious nature of child pornography, the difficulty of catching offenders, and the need for "substantial, indeed, potentially draconian punishment." (App. 231.)

The hideous nature of an offender's conduct must not drive us to forget that it is not *severe* punishment that promotes respect for the law, it is *appropriate* punishment. Although there are clearly times when anything less than severe punishment undermines respect for the law, it is just as certain that unduly severe punishment can negatively affect the public's attitude

toward the law and toward the criminal justice system. It is no doubt partly for that reason that jurists have referred to the responsibility of sentencing as "daunting." *See United States v. Grober*, --- F. Supp. 2d ---, 2008 WL 5395768, at *1 (D.N.J. Dec. 22, 2008) (quoting then Chief Judge Becker in *United States v.Faulks,* 201 F.3d 208, 209 (3d Cir. 2000)). The power and responsibility of a sentencing court is indeed, nothing short of "daunting." It requires a careful balancing of societal and individual needs, and an ability to determine a sentence based on dispassionate analysis of those often competing concerns.

It has often been stated that possession and distribution of child pornography are very serious crimes that have a terrible impact on real victims. *See United States v. Goff*, 501 F.3d 250, 258 n.13 & 259 (3d Cir. 2007) (noting "evidence of Congress's intent that offenses involving child pornography be treated severely" as well as the impact on children who are "exploited,

68

molested and raped" to support the demand of the industry). No one could sincerely disagree with that statement, and the seriousness of the crimes is reflected in the penalties that Congress has prescribed as well as in the Guidelines that have been promulgated by the Sentencing Commission. However, revulsion over these crimes can not blind us as jurists to the individual circumstances of the offenders who commit them. *Id.* at 260 ("Child pornography is so odious, so obviously at odds with common decency, that there is a real risk that offenders will be subjected to indiscriminate punishment based solely on the repugnance of the crime and in disregard of other Congressionally mandated sentencing considerations.").[20]

---

[20] For an exceedingly thoughtful discussion of the tension between sentencing policy and sentencing practice in the area of child pornography *see*, *Grober*, *supra*. The discussion there not only reflects the difficulty of imposing reasonable sentences in this area, it also reflects the painstakingly careful approach of that sentencing judge in

As we have emphasized, the "overarching principle" of parsimony that Congress included in § 3553 directs the courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in [this section]." 18 U.S.C. § 3553(a).

A district court has a duty, to evaluate the quality of mitigating evidence presented to it. Yet, here, the district court concluded that "draconian" punishment was warranted with only minimal consideration of substantial evidence to the contrary. The Supreme Court has recently stated:

> The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances. . . . In the [sentencing] context, a statement of reasons is important. The sentencing judge should set forth

trying to tailor an appropriate sentence given the offender before her, an applicable mandatory minimum sentence, and the parameters contained in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

70

enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority. . . . Where the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence, however, the judge will normally go further and explain why he has rejected those arguments.

*Rita v. United States*, 127 S. Ct. 2456, 2468 (2007). There was clearly nothing frivolous about defense counsel's argument that Olhovsky was not a typical offender nor counsel's suggestion that his crime did not fall within the minerun of cases the Guidelines are intended to address. The court responded by stating: "[t]he guidelines [] have been issued [] for a reason. . .", and that strongly suggests that the court did not give adequate consideration to the extent to which Olhovsky fit within the "heartland" of offenders.[21]

---

[21] *Cf. United States v. Iannone*, 184 F.3d 214, 226 (3d Cir. 1999) (explaining that the Guidelines are designed for the

As we have explained, that is but one example of the procedural errors committed by the district court. In *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008), we explained that "procedural problems may lead to substantive problems, so there are times when a discussion of procedural error will necessarily raise questions about the substantive reasonableness of a sentence." This is clearly such a case. Given the factual and procedural error here, it was substantively unreasonable to sentence Olhovsky to six years imprisonment. On remand, the district court will impose a reasonable sentence based upon all of the § 3553(a) factors, including the "overarching" principle of parsimony.

**IV.**

---

"heartland" of cases and that "[i]n the unusual case . . . the court may consider a departure from the Guidelines sentence").

72

Because the district court erred in ruling that Dr. Silverman could not be subpoenaed to testify as an expert, and because the court's failure to consider Olhovsky's individual circumstances pursuant to 18 U.S.C. § 3553(a) resulted in an unreasonable sentence, we will vacate the sentence and remand for further proceedings consistent with this opinion.