PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-1861

———

UNITED STATES OF AMERICA,

v.

RICHARD D. KING, JR.,
                              Appellant

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 04-cr-00071)
District Judge: Honorable John E. Jones, III

———

Argued October 27, 2009
Before: SLOVITER, FUENTES and HARDIMAN, *Circuit Judges*.

(Filed: April 30, 2010)

Frederick E. Martin (Argued)
Office of United States Attorney
240 West Third Street

Suite 316
Williamsport, PA 17701-0000
    *Attorneys for Appellee*

Ronald C. Travis (Argued)
Rieders, Travis, Humphrey, Harris,
    Waters & Waffenschmidt
161 West Third Street
P.O. Box 215
Williamsport, PA 17701-0000
    *Attorneys for Appellant*

———

OPINION OF THE COURT

———


HARDIMAN, *Circuit Judge*.

Richard King appeals his judgment of sentence following a conditional guilty plea to violating 18 U.S.C. § 2241(c) (Interstate Transportation to Engage in Sex with a Minor). The principal question of precedential import is whether the rule of law established in *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006), *viz.*, that a present and objecting resident can override another resident's consent to search a home, applies to the seizure of a computer. We hold that it does not.

I.

2

In August 2003, King was using the screen name "ayoungbeaverluvr" when he met Angela Larkin on a website called "CherryPoppinDaddys." In their initial conversation, King acknowledged that performing oral sex on his own daughter caused his divorce. He also offered to drive over 200 miles from his home in Mohnton, Pennsylvania, to Larkin's home in Emporium, Pennsylvania, so he could perform oral sex on Larkin's two-year-old daughter, whom she called "Peanut."[1]

During the next two months, King and Larkin chatted online about their mutual interest in watching minors engage in sex acts with adults and shared child pornography. After Larkin said she liked one depiction of a young child engaged in a sex act with an adult, King responded he would "most definitely" do the same to Peanut. In September 2003, King chatted with others about his sexual interest in Peanut. That same month, Larkin also sent nude pictures of Peanut to King and others.

In addition to his involvement with Larkin and her daughter, King maintained several online relationships with underage girls to whom he sent child pornography. As part of his self-professed desire to "sexually initiate" them, King taught them to masturbate and sent them pictures of his genitals.

Larkin briefly lost contact with King in October 2003 when she left her husband and moved with Peanut and her computer to Buffalo, New York. In mid-November 2003,

---

[1] We refer to Larkin's daughter as "Peanut" to protect her privacy.

however, Larkin contacted King through a series of e-mails and phone calls, asking to move in with him because she was unhappy in Buffalo. King responded by e-mail: "you know what my fantasy is." Soon thereafter, Larkin e-mailed King to ask if Peanut would sexually satisfy him. Following these internet exchanges, on Thanksgiving Day 2003, King drove to Buffalo, where he picked up Larkin and Peanut and brought them to his home in Mohnton, Pennsylvania.

Within a week after Larkin moved in with him, King began performing oral sex on Peanut. Though they lived under the same roof, King and Larkin continued corresponding via e-mails that show King's sexual contact with Peanut was frequent enough to make Larkin jealous. King also helped Larkin use a PayPal account to obtain payment for distributing pornographic images of Peanut over the internet.

Larkin's conduct was discovered by law enforcement agents in mid-February 2004 after pornographic images of Peanut were found on a computer in Texas. The Texas authorities promptly notified the Pennsylvania State Police, who in turn notified Special Agent James Kyle of the Federal Bureau of Investigation, of a potential child pornography victim in Emporium, Pennsylvania. On February 19, 2004, Agent Kyle obtained and executed a warrant to search Larkin's former residence in Emporium.

Upon his arrival at Larkin's former residence, Agent Kyle determined that the furniture and distinctive walls matched those depicted in the child pornography images found in Texas. While executing the warrant, Kyle met Larkin's ex-husband,

4

Robert McCullen, who stated that Larkin had moved to Buffalo in the fall with Peanut and her computer. After Kyle explained the nature of his investigation, McCullen identified the girl in the pictures as his daughter. Because McCullen was unaware of Larkin's whereabouts after she left Buffalo, he sent Larkin an instant message asking her for a phone number where she and Peanut could be reached. Larkin responded a few hours later with a phone number. Officers initially traced the number to a post office box in Mohnton, but further investigation revealed that it was connected to King's residence at 93 Pennypacker Road in Mohnton.

Although Larkin had no warrants in the National Crime Information Center database, Agent Kyle called the State Police in Reading, Pennsylvania, apprised them of the situation, and asked them to check for local warrants. This search located an outstanding 2002 bench warrant for Larkin's arrest issued by the Court of Common Pleas of Potter County. After receiving confirmation that the arrest warrant was still active—and after independently verifying the connection between the phone number and 93 Pennypacker Road—State Police Troopers Coyle and Rodriguez proceeded to King's residence to execute the arrest warrant.

When King answered the door, Troopers Coyle and Rodriguez advised him of the warrant for Larkin's arrest and asked to see her. King led them upstairs to the hallway right outside the kitchen where they handcuffed Larkin; for officer safety they asked the other residents—King, his mother and his step-father—to stay put. At some point, Peanut joined them in

the hall. From where they stood, the officers could not see into the bedrooms down the hall.

While at King's residence, Trooper Coyle received a phone call from an officer who suggested that Coyle ask Larkin for permission to take her computer. After Larkin consented to the seizure, King walked the troopers to a bedroom down the hall and disconnected the computer. Before the troopers could seize it, however, King claimed ownership of the hard drive and objected to its seizure. King then requested permission to remove the hard drive, but the troopers denied his request and seized the computer, including the hard drive. The troopers departed King's residence with Larkin, Peanut and the computer.

The next day, Agent Kyle and another FBI agent transported Larkin to the Clinton County Correctional Facility in the Middle District of Pennsylvania. During the drive, Larkin signed a form authorizing the FBI to assume her online identity and disclosed all of her passwords. Upon receiving this authorization, Agent Kyle called a colleague and requested that Larkin's passwords be changed to preserve the content of her e-mails.

The following Tuesday, King contacted two of Larkin's other "customers," Rod Long and Kenneth Amerine, to warn them that the FBI was using Larkin's screen names. King also told Amerine that he "just threw away [three] 120 gig hard drives" and that the only way to destroy a hard drive is by removing it and physically destroying it with a hammer, so the FBI cannot recover anything. There is no direct proof that King

or Amerine destroyed any evidence, but no child pornography was found on Amerine's computer even though he admitted viewing it.

Later that week, when Agent Kyle reviewed Larkin's e-mails and chats, he found incriminating conversations between Larkin and King, including the conversations about Peanut. With this evidence in hand, on March 3, 2004, Agent Kyle obtained and executed two search warrants—one for the seized computer and the other for King's home, including all computers contained therein. Although King was not home when Agent Kyle executed the warrant, King spoke with Kyle over the phone and initially declined Kyle's invitation to speak with him in person. That night, King changed his mind and called to arrange a meeting with Kyle at the FBI's office in Williamsport, Pennsylvania, which is near the Clinton County Correctional Facility where Larkin was housed. Because King planned to be in the area to visit Larkin the next Saturday, March 6, 2003, he arranged to meet Kyle that day.

King got lost on the way to Williamsport and arrived late Saturday afternoon when the front doors were locked and the building was relatively empty. Agent Kyle opened the door for King and, after patting him down for weapons, led him to the FBI office. Agent Kyle entered a code to unlock the office door, which remained unlocked from the inside, and led King to an interrogation room. Before asking any questions, Agent Kyle told King he was free to leave at any time and that the interview was voluntary. Because no other FBI agents were in the Williamsport office at the time, an agent in the Philadelphia office listened over the phone.

7

Over the course of several hours, King admitted performing oral sex on Peanut and traveling to New York for that purpose. Agent Kyle showed King the incriminating e-mails he retrieved from Larkin's account, and then asked King about his online relationships with other young girls as well as about the thousands of child pornography images found on King's computer. King admitted to a long-standing interest in sexual contact with young girls that began with his own daughter. When the interview ended, visiting hours at the Clinton County Correctional Facility were over, so Agent Kyle tried to arrange for King to visit Larkin, but he was unsuccessful. King then departed.

## II.

Larkin was indicted in the Middle District of Pennsylvania on February 26, 2004. On April 8, 2004, a superseding indictment charged King with the offense at issue in this appeal (18 U.S.C. § 2241(c)) and he promptly surrendered to authorities. One year later, on April 15, 2005, a second superseding indictment added charges against King for sending and causing the receipt of child pornographic images through interstate commerce in violation of 18 U.S.C. § 2252(a)(1)(A) and conspiracy to destroy evidence and obstruct an official proceeding under 18 U.S.C. § 1512(c).

After entering a plea of not guilty, King moved to suppress all evidence obtained on February 19, 2004, claiming that the entry into his home and the seizure of Larkin's computer violated the Fourth Amendment. King also argued that his statements to Agent Kyle on March 6, 2004 should be

8

suppressed because the interrogation violated his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). The District Court denied the motion on April 13, 2006, finding the entry into King's home valid because the police had an arrest warrant and probable cause to believe that Larkin was in the home.[2] The District Court also held that seizure of the computer was proper because Larkin consented and King assumed the risk of Larkin's consent by installing his hard drive therein.[3] Finally, the District Court held that the interrogation did not violate *Miranda* because it was not custodial.

Following the District Court's denial of his motion to suppress, on April 17, 2006, King entered a conditional guilty plea to one count of violating 18 U.S.C. § 2241(c). In exchange for King's plea, the Government agreed to: (1) dismiss the other charges; (2) recommend a two-point downward departure for acceptance of responsibility under section 3E1.1(a) of the

---

[2] Alternatively, the District Court held that entry was justified by exigent circumstances because Peanut was in danger. We do not reach this issue.

[3] Alternatively, the District Court held—as does our concurring colleague, Judge Fuentes—that the seizure was justified by exigent circumstances. We do not reach this issue. Although Judge Sloviter fully agrees with this opinion, she does not disagree with Judge Fuentes's concurrence and believes that under either rationale there is no constitutional objection to the seizure of the computer.

United States Sentencing Guidelines (USSG); and (3) recommend a one-level downward departure for substantial assistance under USSG § 5K1.1. During the plea colloquy, King admitted that "one of the many reasons" he traveled to and from Buffalo was to have sex with Peanut, a minor under the age of twelve. The District Court accepted King's guilty plea.

On October 15, 2006, King's attorney moved to withdraw as counsel and to withdraw King's guilty plea. The District Court appointed new counsel, who argued that King should be allowed to withdraw his guilty plea because he was innocent and because the Government failed to turn over various documents, including *Brady* materials. The District Court denied King's motion on June 8, 2007, finding insufficient justification for withdrawal of the plea because King did not assert actual innocence and because all materials were turned over to King's attorneys in a timely fashion.

On October 11, 2007, King filed a second motion to withdraw guilty plea, this time claiming that he lacked the requisite mental capacity to enter a valid guilty plea. The District Court denied that motion on May 16, 2008, finding King was mentally competent based on testimony from his prior counsel and his conduct in court. After resolving these motions, the District Court ordered the preparation of a fourth version of the Presentence Investigation Report, scheduled a conference for August 25, 2008, and ultimately scheduled a presentence hearing for October 25, 2008.

The District Court determined King's applicable Sentencing Guidelines range and ruled on all departure motions

on February 4, 2009.[4]  The District Court began with a base offense level of 27 and added the following upward departures under the Sentencing Guidelines: (1) four levels because the victim was under the age of twelve, § 2A3.1(b)(2); (2) two levels for care, custody or supervisory control over the victim, § 2A3.1(b)(3)(A); (3) two levels because a computer was used to facilitate the travel, § 2A3.1(b)(6)(B); (4) two levels for obstruction of justice, § 3C1.1; and (5) five levels for aggravating circumstances, § 5K2.0(a)(1)(B).  The District Court also denied downward departures for acceptance of responsibility under § 3E1.1 and substantial assistance under § 5K1.1.  In the final analysis, King's total offense level was 42 and his criminal history category was II, resulting in a Guidelines range of 360 months to life imprisonment.

The District Court sentenced King on March 16, 2009. The sentencing hearing included testimony from Peanut's guardian, which was taken *in camera* and sealed.  In open court, the District Court considered the 18 U.S.C. § 3553(a) factors and sentenced King to 360 months imprisonment, supervised release for a term of life, and the mandatory $100 special assessment.  King filed this timely appeal, claiming that the District Court erred in: (1) denying his motion to suppress; (2) denying his motion to withdraw guilty plea; and (3) sentencing

---

[4] The District Court applied the 2003 version of the Sentencing Guidelines.

11

him to 360 months in prison. We address each argument in turn.[5]

III.

We begin by considering King's motion to suppress, in which he argued that his Fourth and Fifth Amendment rights were violated. We "review[] the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

A.

King claims the police violated the Fourth Amendment when they entered his house on February 19, 2004 and seized his hard drive without a warrant or his consent. He does not dispute that Larkin consented to the seizure of her computer, which included the hard drive that King had installed. Nor does the Government dispute that King objected to the seizure of his hard drive and asked agents for the opportunity to remove it from Larkin's computer. These facts present a novel question of law: when an owner of a computer consents to its seizure, does that consent include the computer's hard drive even when it was installed by another who claims ownership of it and objects to its seizure?

_____

[5] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

Answering the pivotal question in the negative, King relies on *Georgia v. Randolph*, where the Supreme Court held that police cannot search a home based on one resident's consent when another resident objects to the search. 547 U.S. at 122-23. The District Court considered this argument and rejected it, relying on *United States v. Matlock*, 415 U.S. 164 (1974), where the Supreme Court held that granting a third party "common authority" over personalty "assume[s] the risk" that the third party will consent to its search. *Id.* at 170-71.

Although both *Randolph* and *Matlock* bear on our decision in this appeal, we find neither one controlling because the facts of this case place it somewhere between those cases. In *Matlock*, the Supreme Court established that consent from one with "common authority . . . is valid as against the *absent*, nonconsenting person with whom that authority is shared." 415 U.S. at 170-71 & n.7 (emphasis added). The Court reasoned that when someone grants common authority to another, he assumes the risk that the co-user will consent to a search of that common area or item. *Id.* Although this rule specifically applies to either "premises or *effects*," *id.*, the Court was not faced with a situation—like the instant appeal and *Randolph*—where another party is present and objecting to the police action.

In *Randolph*, although the Supreme Court resolved the question of an objecting resident's ability to vitiate the consent of his co-tenant, the Court was not presented with a situation—like the instant appeal and *Matlock*—where personal "effects" were at issue. *Randolph* merely held "that a warrantless search of a shared *dwelling* for evidence over the

13

express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident."  547 U.S. at 120 (emphasis added).

To our knowledge, the only federal appellate decision to address this issue after *Randolph* is the Ninth Circuit's alternate holding in *United States v. Murphy*, 516 F.3d 1117, 1124 (9th Cir. 2008), which was not cited by the parties.  In that case, Murphy was living in, and running a methamphetamine lab out of, a storage unit rented by Roper. *Id.* at 1119.  Police searched the unit based on Roper's consent, even though Murphy objected. *Id.* at 1119-20.  Citing *Randolph*, Murphy argued that his objection overcame Roper's consent. *Id.* at 1121.  The Ninth Circuit agreed, finding the storage unit was a dwelling, albeit an unconventional one. *Id.* at 1124.  In the alternative, the Ninth Circuit opined that *Randolph* would apply even if the unit were not a dwelling, because "there is no reason that the rule in *Randolph* should be limited to residences." *Id.*  The Ninth Circuit reasoned that *Randolph* is based on "common authority," which had been extended "well beyond residences." *Id.*

As we shall explain, our reading of *Randolph* leads us to disagree with the Ninth Circuit's reasoning in *Murphy.*  Although the majority opinion in *Randolph* did not directly address personalty, our review of three opinions filed in *Randolph* leads us to conclude that the Supreme Court implicitly limited its holding to searches and seizures of the home.  To fully understand that implication, we must begin with the primary dissent.

14

In his dissent, Chief Justice Roberts addressed our issue directly, explaining that *Matlock* provides the baseline rule for co-user objections to searches of personal effects. *Randolph*, 547 U.S. at 128 (Roberts, C.J., dissenting). Co-user consent is effective because the act of sharing property frustrates the owner's reasonable expectation of privacy with regard to the co-user. *Id.* at 131 ("by sharing private space, privacy 'has already been frustrated with respect to'" the person with whom it is shared (quoting *United States v. Jacobsen*, 466 U.S. 109, 117 (1984))). Consequently, once an owner shares personalty or a secret, he assumes the risk that his confidante will share it with the police. *Id.* Furthermore, after the owner relinquishes his reasonable expectation of privacy regarding the confidante, his presence and objection cannot undermine her consent. *Id.* at 128, 131. Chief Justice Roberts illustrated this rule with an example that anticipated the facts presented here: "If two roommates share a computer and one keeps pirated software on a shared drive, he might assume that his roommate will not inform the government. But that person has given up his privacy with respect to his roommate by saving the software on their shared computer." *Id.* at 131. The dissent also argued that this rule should extend to the home:

> [J]ust as an individual who has shared illegal plans or incriminating documents with another cannot interpose an objection when that other person turns the information over to the government, just because the individual happens to be present at the time, so too someone who shares a place with another cannot interpose an objection when that person decides to grant access

15

to the police, simply because the objecting individual happens to be present.

*Id.* at 128.

Writing for the Court in *Randolph*, Justice Souter never disagreed with Chief Justice Roberts about the rule for personalty.  In fact, Justice Souter rejected the dissent's attempt to equate the home with a secret as a "false equation [that] suggests a deliberate intent to devalue the importance of the privacy of a dwelling place."  547 U.S. at 115 n.4.  This rejoinder strongly implies that the majority agreed with the dissent's rule for personalty and secrets but rejected it as to the home because of the home's privileged status in Fourth Amendment jurisprudence.  *See, e.g., id.*  Furthermore, the majority crafted its rule using terms that apply solely to dwellings.  For example, when explaining the "fine line" drawn between *Randolph* and prior precedents, the Court stated that *Randolph* applies "if a potential defendant with self-interest in objecting is in fact *at the door* and objects."  *Id.* at 121.  These terms, combined with the majority's emphasis on the sanctity of the home, strongly imply that the *Randolph* rule applies only to a dwelling place.

We also find it significant that the majority's fifth vote in *Randolph* limited his concurrence to the facts of the case.  547 U.S. at 127 (Breyer, J., concurring) (joining the majority "[g]iven the case-specific nature of the Court's holding").  Like the majority, Justice Breyer used terms that apply only to a dwelling, without making any reference to personal effects. *See,*

*e.g., id.* at 126-27 (referring to "officers seeking to enter the *house*" and "to enter a *home*" (emphasis added)).

In sum, our reading of Justice Souter's opinion for the Court, Justice Breyer's concurrence, and Chief Justice Roberts's dissent, leads us to conclude that the rule of law established in *Randolph* does not extend beyond the home.[6]

Because *Randolph* does not apply to personal effects, King's suppression argument necessarily fails. A computer is a personal effect, *see, e.g, Andrus*, 483 F.3d at 718-20

---

[6] Contrary to the concurrence's assertion, this rule does not risk encroaching on Fourth Amendment rights. Computer users can protect their files by using a password, just as one who shares a footlocker can protect his photographs by placing them in a locked container inside the footlocker. *See, e.g., United States v. Andrus*, 483 F.3d 711, 718-20 (10th Cir. 2007); *United States v. Kim*, 27 F.3d 947, 957 (3d Cir. 1994) (explaining that consent to search an area does not include consent to search locked containers in that area); *see also Randolph*, 547 U.S. at 135 (Roberts, C.J., dissenting) ("To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his *own* consent, he is free to place these items in an area over which others do *not* share access and control, be it a private room or a locked suitcase under a bed."). For example, in *Trulock v. Freeh*, the Fourth Circuit found that a defendant who protected his files with a password, had not "assumed the risk" that his co-user "would permit others to search his files." 275 F.3d 391, 403 (4th Cir. 2001).

(analogizing a computer to a container). Therefore, we apply the *Matlock* rule and ask whether King relinquished his privacy in the hard drive with respect to Larkin. Here, King placed his hard drive inside the computer Larkin owned and that the two of them shared, without any password protection. As a result, he assumed the risk that Larkin would consent to its seizure. Accordingly, the District Court did not err in holding that the seizure of Larkin's computer did not violate the Fourth Amendment and evidence derived therefrom was admissible against King.

B.

We next turn to King's claim that Troopers Coyle and Rodriguez violated the Fourth Amendment when they entered 93 Pennypacker Road to execute the arrest warrant on Larkin. Officers may enter a third party's residence to arrest the subject of an arrest warrant if they have probable cause to believe she is inside. *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005). In assessing "whether the police had probable cause to believe a suspect was residing and present in a home, we apply a common sense approach and consider the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality." *United States v. Veal*, 453 F.3d 164, 167-68 (3d Cir. 2006) (internal quotation omitted).

King claims the State Police lacked probable cause to enter his residence because the phone number initially was traced to a post office box and they failed to stake out King's home to determine whether Larkin was inside. King correctly notes that the phone number Larkin gave to McCullen was

18

initially traced to a post office box. As the District Court noted, however, the Government quickly traced the phone number to 93 Pennypacker Road after determining that the number quite obviously could not apply to a post office box. Accordingly, the District Court committed no error—much less clear error—when it found that the telephone number "was ultimately traced" to King's home.

The District Court did commit one factual error which, to its credit, the Government acknowledges. The District Court found that McCullen told the officers Larkin moved to the Berks County area. In fact, McCullen told Agent Kyle that he did not know where Larkin went after she left Buffalo. Therefore, we evaluate whether probable cause existed to believe that Larkin was in King's residence without considering this errant fact.

Applying plenary review to the properly found facts, we hold the State Police had probable cause to believe Larkin was in King's residence. The State Police knew not merely that Larkin had left Buffalo; they knew that a few hours earlier Larkin said she and Peanut could be reached at a phone number traced to 93 Pennypacker Road. Under the totality of the circumstances, these facts provided probable cause for the State Police to believe Larkin was at King's residence when they went there to execute the arrest warrant.

C.

King also claims a violation of his Fifth Amendment rights on March 6, 2004, when Agent Kyle interviewed him at the Williamsport FBI office without administering *Miranda*

warnings. The disposition of this question turns on whether that interview constituted a "custodial interrogation."

*Miranda* applies to those "in custody." *Miranda*, 384 U.S. at 467-68. One is "in custody" when the authorities say or do something objectively indicating "they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). We consider five factors to determine whether King was objectively free to leave:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Id.* at 359-60.

Applying the five factors to the facts of this case, some favor King's position and some favor the Government's position. The second and third factors—the location of the interrogation and its length—favor King. The FBI office is inherently more intimidating than most locations such as a business office, an automobile, or a public street. Likewise, the interrogation was fairly long, lasting several hours. On the other hand, the first, fourth, and fifth factors all favor the

20

Government. Agent Kyle specifically told King he was not under arrest, the office door was not locked from the inside, King could have exited at any time, and there is no evidence that Agent Kyle used any coercive tactics. Finally, King voluntarily submitted to the questioning after previously refusing, and departed when he chose to do so. Therefore, it was objectively reasonable for King to think he was free to leave.

Our conclusion is supported by the factual similarity between this appeal and the interrogation that the Supreme Court held to be non-custodial in *Oregon v. Mathiason*, 429 U.S. 492 (1977). In that case, "Mathiason (1) had come to the station voluntarily, (2) was informed that he was not under arrest, and (3) left the interview without hindrance." *United States v. Jacobs*, 431 F.3d 99, 106 (3d Cir. 2005) (citing *Mathiason*, 429 U.S. at 495). Accordingly, we hold that King was not "in custody" for purposes of *Miranda*, so the District Court did not err in finding no violation of King's Fifth Amendment rights.

IV.

We next address King's challenge to the District Court's denial of his motion to withdraw guilty plea. King bore a "substantial" burden, *United States v. Jones*, 336 F.3d 245, 252 (3d Cir. 2000), of showing a "fair and just reason" for the withdrawal of his plea. Fed. R. Crim. P. 11(d)(2). We review the District Court's denial of a motion to withdraw guilty plea for abuse of discretion. *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001).

21

In determining whether a "fair and just reason" existed for withdrawal of a defendant's plea, district courts consider whether: (1) the defendant "asserts his innocence;" (2) the defendant proffered strong reasons justifying the withdrawal; and (3) the government would be prejudiced by the withdrawal. *United States v. Martinez*, 785 F.2d 111, 114 (3d Cir. 1986). King claims to have satisfied all three factors.

King purports to have asserted innocence when he argued to the District Court that he was "factually innocent in the Middle District" because all of his sexual contact with Peanut occurred at his home in the Eastern District of Pennsylvania. This argument, first proffered in the motion to withdraw, fails for several reasons.

First, King waived this issue. He tries to avoid waiver by framing his claim of actual innocence as a non-waivable jurisdictional defect, but his effort fails because all federal courts have jurisdiction to hear criminal cases arising under federal statutes such as 18 U.S.C. § 2241(c). 18 U.S.C. § 3231; *see also United States v. Polin*, 323 F.2d 549, 556 (3d Cir. 1963). As we have explained, challenges to the appropriate district court are actually challenges to venue. *United States v. Robinson*, 167 F.3d 824, 829 (3d Cir. 1999). By pleading guilty in the United States District Court for the Middle District of Pennsylvania, King waived any claim of improper venue. *See Washington v. Sobina*, 475 F.3d 162, 165 (3d Cir. 2007) (holding entry of a guilty plea waives all non-jurisdictional issues).

22

Second, even had King preserved the argument, venue was proper in the Middle District of Pennsylvania because it was a "district wherein the crime shall have been committed." U.S. Const. amend. VI. The offense of interstate transportation to engage in sex with a minor contains three elements: (1) crossing interstate lines; (2) with the intent to engage in a sexual act with a minor; and (3) either performing or attempting to perform the act. 18 U.S.C. § 2241(c); *see also United States v. Cryar*, 232 F.3d 1318, 1321-22 (10th Cir. 2000). Because this a continuing offense, venue is appropriate in any district where King transported or abused Peanut. 18 U.S.C. § 3237(a) ("[A]ny offense against the United States . . . committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."); *see also Cryar*, 232 F.3d at 1321-22 (applying 18 U.S.C. § 3237(a) to prosecutions under 18 U.S.C. § 2241(c)). Because King drove through the Middle District of Pennsylvania on his way to and from Buffalo, New York, venue was appropriate there.

Apart from his venue argument, King advances the specious claim that although he intended to transport Peanut and intended to have sex with her, he asserted innocence because he did not admit to having the requisite intent *while crossing* state lines. But the requisite intent may be formed at any point during the "interstate travel" as long as the defendant traveled "for the purpose of engaging in the unlawful sexual act." *United States v. Tykarsky*, 446 F.3d 458, 471 (3d Cir. 2006) (citing *United States v. Hayward*, 359 F.3d 631, 638 (3d Cir. 2004)); *see also Cryar*, 232 F.3d at 1324 (pointing to evidence from before the

23

drive, including conversations expressing sexual interest in the attempted victim).

Furthermore, the evidence shows that having sex with Peanut was the purpose of King's travel and that he formed this purpose before he drove to Buffalo, not a week later, as he claims. A bald assertion of innocence is inadequate; it must be supported by the facts. *Brown*, 250 F.3d at 818. Here, e-mails and instant messages King sent to Larkin and others demonstrate that he intended to have sex with Peanut. For example, while discussing Larkin's request to move in, King reminded her of his "fantasy" and Larkin asked King if Peanut "would be enough" to satisfy him. King also told others of his sexual interest in Peanut. Finally, King admitted to Agent Kyle that when he left for Buffalo he knew he would have sex with Peanut, and he admitted engaging in sex acts with Peanut multiple times during her first week in Mohnton. For all these reasons, the District Court did not abuse its discretion when it found that King did not assert actual innocence.

As for the second prong—reasons justifying the withdrawal—King simply rehashes his "factual innocence" argument, claiming lack of jurisdiction is the most compelling reason to allow withdrawal of his guilty plea. King was required, however, to explain why he changed his mind following his guilty plea. *United States v. Jones*, 336 F.3d 245, 253 (3d Cir. 2003). King could have objected to venue much sooner and cites no reason for his belated change of heart. The absence of any explanation is strong support for the District Court's finding that King suffered from "pleader's remorse" once he learned of the proposed Guidelines range in his

24

Presentence Investigation Report.[7]  But changing one's mind is not a sufficient reason to justify withdrawal of a guilty plea. *E.g., United States v. Isaac*, 141 F.3d 477, 485 (3d Cir. 1998). Therefore, the District Court did not abuse its discretion when it found that King failed to proffer strong reasons justifying the withdrawal of his plea.

We cannot find a "fair and just reason" to justify withdrawal of King's guilty plea because he failed to satisfy either the first or second prong of the test.  Therefore, we hold that the District Court did not abuse its discretion when it denied King's motion to withdraw guilty plea.[8]

---

[7] The District Court made King aware during the plea colloquy that it could impose punishments up to the statutory maximum punishment of life imprisonment, $250,000 in fines, a $100 special assessment, and a life term of supervised release, in addition to restitution.  And King specifically acknowledged that potential maximum sentence.  But as of that date, the initial proposed Guidelines range, not including the § 5K1 motion, was 151 to 168 months.  King first moved to withdraw his guilty plea less than two months after he received the Presentence Investigation Report, which proposed a Guidelines range of 360 months to life.

[8] King also challenges his competence to enter the guilty plea but as the District Court found, King was competent.  In addition to King's attorneys testifying that he was competent, King alertly caught a nuanced mistake during the plea colloquy, which shows that he understood the proceeding and the rights he

V.

We now turn to King's appeal of his sentence. King acknowledges that the District Court properly calculated his initial Guidelines range, but claims it erred when ruling on various departure motions and failed to grant him a downward variance under 18 U.S.C. § 3553(a).

At step two of the test we established in *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006), the District Court denied the Government's motion for a downward departure for acceptance of responsibility under USSG § 3E1.1, while imposing a five level upward departure for aggravating circumstances under § 5K2.0. King appeals both of those decisions, which we review for abuse of discretion.[9] *United States v. Tomko*, 562 F.3d 558, 567-68 (3d Cir. 2009) (*en banc*).

A.

---

was waiving.

[9] King also appeals the denial of the Government's motion for a downward departure for substantial assistance under § 5K1.1. But we lack jurisdiction to review such a denial unless the District Court was unaware of its discretion to grant the motion, *United States v. Cooper*, 437 F.3d 324, 332-33 (3d Cir. 2006), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007), and King does not argue that the District Court lacked such knowledge.

26

The District Court denied the Government's motion for a two-level reduction for acceptance of responsibility under § 3E1.1 because King obstructed the investigation, subsequently denied elements of the crime, and blamed his crime on others, including the victim. King claims he is entitled to the departure because he saved taxpayers the cost of a trial, assisted the FBI, and surrendered promptly. The Guidelines require a defendant to "clearly demonstrate[] acceptance of responsibility,"§ 3E1.1(a), and we give the District Court "great deference on review," because "the sentencing judge is in a unique position to evaluate the defendant's acceptance of responsibility." *Id.* App. Note 5; *see also United States v. Dullum*, 560 F.3d 133, 142 (3d Cir. 2009).

The District Court based its decision on the Guidelines Application Notes, which outline some of the appropriate factors to consider in determining whether a defendant "clearly demonstrate[d]" acceptance of responsibility. These factors include admitting all elements of the offense and "relevant conduct," voluntarily assisting in the investigation, surrendering to authorities promptly and voluntarily, and timely accepting responsibility. *See* § 3E1.1 App. Note 1(a), (d), (e) & (h). In contrast, factors that show lack of acceptance include "falsely den[ying], or frivolously contest[ing], relevant conduct that the court determines to be true," *Id.* App. Note 1(a), and receiving an upward departure under § 3C1.1 for obstruction. § 3E1.1 App. Note 4 (the obstruction enhancement "ordinarily indicates that the defendant has not accepted responsibility for his conduct").

27

Although King promptly surrendered to police, admitted his criminal conduct to the FBI, and pleaded guilty, the record is replete with other evidence that he did not accept responsibility. First, King's initial admissions and guilty plea were undermined when he recanted some of those admissions and later sought to withdraw his guilty plea, claiming he was not guilty. Second, after admitting criminal intent during his plea colloquy, King later raised specious arguments denying as much. Third, King received a § 3C1.1 upward departure for obstruction of justice because he destroyed three hard drives containing evidence and taught Amerine how to destroy a computer's hard drive. Finally—and most remarkably—King has consistently attempted to blame others for his reprehensible conduct. He blamed Larkin for pressuring him to have sex with Peanut, claiming he declined her offers for a few days. Most disturbingly, King even blamed his two-year-old victim, claiming she initiated some sexual encounters by climbing on his lap.

For all the foregoing reasons, ample evidence supports the District Court's denial of the Government's motion for downward departure for acceptance of responsibility.[10]

---

[10] King also argues that entering a guilty plea, by itself, automatically entitles him to a one-level departure under *Dullum*. As the District Court explained, however, entering a guilty plea does not entitle a defendant to the § 3E1.1 adjustment "as a matter of right." § 3E1.1 App. Note 3. We did not reverse the District Court's grant of such a one-level downward departure in *Dullum* because the issue was not raised on appeal.

B.

King received a five level upward departure under § 5K2.0(a)(1)(B), which applies when "there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." The District Court found two aggravating circumstances: (1) subsequent statutory and Guidelines amendments show that the applicable Guidelines do not sufficiently punish the crime; and (2) King's pattern of sexually abusing minors, including his own daughter, places his conduct outside the heartland and warrants greater punishment than the ordinary case.

King first argues that the District Court violated the Guidelines' mandate to apply the lower level when there has been an amendment, by relying on Guidelines amendments that post-dated his conduct. USSG § 1B1.11. Contrary to King's argument, the District Court did not *apply* the subsequent amendment. Rather, it considered the Congressional finding behind those amendments to ascertain whether the applicable Guidelines punish his crime adequately. Given Congress' significant role in sentencing, its finding on the adequacy of the Guidelines is an appropriate consideration. "It is, after all, Congress-not the judiciary-[which] is vested with the authority to define, and attempt to solve . . . societal problems." *United States v. Polk*, 546 F.3d 74, 76 (1st Cir. 2008) (internal citations

560 F.3d at 142 n.8. We did, however, deny that the departure was required. *Id.*

29

and quotations omitted).  Although King correctly notes that the District Court's reliance on Congressional findings was based on decisions of the First, Fourth and Seventh Circuits, rather than this Court, we now join those courts in holding that such reliance is proper.  *See id.*; *United States v. Grigg*, 442 F.3d 560, 564-65 (7th Cir. 2006); *United States v. Hecht*, 470 F.3d 177, 182 (4th Cir. 2006).

King also claims the District Court did not have an adequate basis for finding his conduct outside the heartland because it failed to cite statistics.  But we have never required a District Court to cite statistics in support of its § 5K2.0 determinations.  Instead, we have established the following three steps:  (1) "identify the factor or factors that potentially take the case outside the Guidelines' 'heartland' and make it special or unusual"; (2) "determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor, or do not mention the factor at all"; and (3) follow the rule from step two and, if unmentioned, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether [the factor] is sufficient to take the case out of the Guideline's heartland." *United States v. Iannone*, 184 F.3d 214, 226 (3d Cir. 1999) (citing and quoting *Koon v. United States*, 518 U.S. 81, 94-96 (1996)).  In addition to the abuse of discretion standard applied to sentencing determinations, the District Court's § 5K2.0 determination is entitled to heightened deference because district courts "see many more Guidelines cases than appellate courts do," which give them an "institutional advantage . . . over appellate courts in determining whether the facts of a given case take it out of the 'heartland' of Guidelines

30

cases." *Iannone*, 184 F.3d at 227 (citing and quoting *Koon*, 518 U.S. at 98).

The District Court identified King's pattern of repeated sexual abuse as the factor that takes his conduct outside the heartland of the offense. The Guidelines under which the District Court enhanced King's advisory sentencing range account for the victim's age, the defendant's responsibility for the victim's care and the use of a computer in the offense. §§ 2A3.1(a), (b)(2)(A), (3), (6). But those Guidelines do not take into account King's repeated abuse of his daughter or his online predation of minors.

Although King was not criminally charged for abusing his daughter, it was proved relevant conduct. *See United States v. Watts*, 519 U.S. 148, 156 (1997). In addition to the damning e-mails, King admitted to Agent Kyle, and later Probation Officer Noll, that he performed oral sex on his daughter, explaining that it started when she had a diaper rash at six months old and continued because "it made her feel good."

In addition to sexually abusing his daughter, King spent "countless hours" online talking to young girls to, in his words, "sexually initiate" them and to satisfy his desires. He taught them how to masturbate and sent them pictures of child pornography and his own genitals. King requested pictures of them and asked for their addresses to arrange encounters. He even bragged to others with similar predilections about how many girls he engaged online. Thus, a plethora of evidence supports the District Court's finding that King repeatedly

31

sexually abused minors and that such abuse was not covered by the applicable Guidelines.

The Guidelines listing encouraged and discouraged factors for departures do not mention repeated abuse. §§ 5H1.1-1.12, 5K2.0-2.23. Consequently, at step three the District Court determined that King's pattern of sexual abuse was sufficient to take his case outside the heartland in light of similar Guidelines that contain enhancements for recurring abuse. *See Iannone*, 184 F.3d at 228-29 (making this determination based on "two areas of the Guidelines [that] provide specific bases for upward departures based on conduct similar" to the defendant's). For example, some child pornography offenses warrant a five-level upward departure for "a pattern of activity involving the sexual abuse or exploitation of a minor." § 2G2.2(b)(4).[11] The Application Notes explain that "pattern" means "two or more separate instances" of the conduct, regardless of whether they "(A) occurred during the course of the offense; (B) involved the same or different victims; or (C) resulted in a conviction for such conduct." *Id.* App. Note 1. Even though that "enhancement does not apply to [King's] conduct, its rationale does." *Iannone*, 184 F.3d at 228. He repeatedly sexually abused both his daughter and Peanut. As § 2G2.2(b)(4) shows, this

---

[11] That Guideline also provides a five-level upward departure for distributing child pornography to a minor, § 2G2.2(b)(2)(C), and seven levels for distributing with intent to persuade, induce or facilitate the minor's traveling for sexual conduct. § 2G2.2(b)(2)(D). Both of those offenses are analogous to King's online prowling.

32

repeated abuse creates social harm that is not addressed by a Guideline that applies to a single instance of abuse. Therefore, the District Court did not abuse its discretion in departing based on King's repeated abuse.

Once the District Court found that a departure was appropriate, it was also required to set the amount of the departure by "analogizing to existing Guidelines provisions." *Iannone*, 184 F.3d at 229. Importantly, "[w]e are dealing here with *analogies* to the guidelines, which are necessarily more open-textured than *applications* of the guidelines." *United States v. Baird*, 109 F.3d 856, 872 (3d Cir. 1997) (citation omitted). Here, § 2G2.2(b)(5) provides a five-level upward departure for "a pattern of activity involving the sexual abuse or exploitation of a minor," which is consistent with King's conduct. The analogous Guidelines contain departures of five, seven, and eleven levels. Here, the District Court adopted the lowest of those, which was not an abuse of discretion.

## C.

After establishing King's Guidelines imprisonment range as 360 months to life, the District Court applied the factors of 18 U.S.C. § 3553(a) and determined that 360 months incarceration was just and reasonable. King claims his sentence was procedurally and substantively unreasonable.

As a matter of procedure, the sentencing court must give "rational and meaningful consideration" to the § 3353(a) factors. *United States v. Grier*, 475 F.3d 556, 571 (3d Cir. 2007) (en banc). We do not require the District Court to address every

33

factor, as long as "the record makes clear" that it considered each factor. *Tomko*, 562 F.3d at 568. Additionally, the District Court may decide how much discussion each factor warrants. *United States v. Rita*, 551 U.S. 338, 356-57 (2007). As a substantive matter, the District Court must reasonably apply the § 3553(a) factors based on the totality of the circumstances. *Cooper*, 437 F.3d at 329-30; *Tomko*, 562 F.3d at 567.

We review both procedural and substantive determinations for abuse of discretion. *Tomko*, 562 F.3d at 567. If there are no procedural errors, our substantive review is highly deferential and we will affirm "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Id.* at 568.

King claims the District Court failed to give meaningful consideration to his "history and characteristics," 18 U.S.C. § 3553(a)(1), because it did not consider that he came from a "broken home" and was himself a victim of sexual abuse. The Government concedes that the District Court's discussion of King's history and characteristics did not mention those facts, but notes that the District Court addressed King's history of abuse in the context in which it was raised.

During the sentencing hearing, King's attorney briefly outlined King's childhood abuse as a basis for the District Court to find him mentally incompetent, or at least "a damaged person." Counsel concluded that point by saying "the identified problems that Mr. King has are not . . . genetic . . . and therefore something had to happen to him." The District Court addressed

34

King's mental heath issues, "agree[ing] with [defense counsel] that there are myriad mental health questions that arise from the testimony that this court has received" but concluded that King was competent. After King's attorney discussed the abuse in only one sentence, the District Court was not required to address the issue in detail, especially given its considerable discretion. Therefore, the District Court committed no procedural error at King's sentencing. *See Rita*, 551 U.S. at 356-57.

Absent a procedural error, we review King's substantive challenges for abuse of discretion to determine whether the § 3553(a) "factors were reasonably applied to the circumstances of the case." *Cooper*, 437 F.3d at 330. We will affirm if a "reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Tomko*, 562 F.3d at 568. King raises several substantive challenges, none of which overcomes this high hurdle.[12]

---

[12] King argues that the District Court improperly counted the severity of the crime, his failure to accept responsibility and his obstruction when deciding both departures and reasonableness under § 3553(a). Such double counting is allowed, however. *Tomko*, 562 F.3d at 583 ("[U]nder § 3553(a), the District Court was permitted to give further weight to a factor covered by a specific Guidelines provision."); *United States v. Greenidge*, 495 F.3d 85, 103 (3d Cir. 2007) ("We emphasize that a sentencing court is not prohibited from considering the factual basis underlying a defendant's sentence enhancement [in the § 3553(a) analysis], and indeed, *should*

First, King claims his sentence is unreasonable because his conduct was not more severe than other abusers of Peanut who received shorter sentences and because his conduct was less severe than Larkin's, who also was sentenced to 360 months imprisonment. Although King admits that his conduct was severe, he argues that another perpetrator inflicted worse harm by infecting Peanut and her older sister with a sexually transmitted disease. Similarly, King argues that his conduct was less severe than Larkin's because she sought out men to abuse her own daughter. We are unpersuaded by these comparisons because sentencing disparities are unreasonable only when the defendants are similarly situated. 18 U.S.C. § 3553(a)(6) (requiring the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); *see also United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) (citing 18 U.S.C. § 3553(a)(6)).

The District Court properly distinguished King's conduct from that of Larkin and the other perpetrators. The only perpetrator convicted of the same crime as King received a lower sentence because, unlike King, he accepted responsibility, provided substantial assistance, did not obstruct the investigation and had a lower criminal history. The other perpetrators were sentenced for lesser crimes, did not have regular contact with Peanut, and did not exercise care or control over her. As for Larkin, she pleaded guilty to a lesser crime

consider those facts in order to tailor the sentence to the defendant's individual circumstances.").

36

than King.[13]   Those differences justify King's term of incarceration.   *See Parker*, 462 F.3d at 278 (holding co-defendants were not similarly situated because one had a less extensive criminal history).

Second, King claims that the District Court's sentence was substantively unreasonable because it did not consider the significance of the abuse King suffered as a child.  As we noted previously, that issue was considered and addressed in the context in which King's counsel presented it.  The District Court did not abuse its discretion in this regard.

Third, King claims his sentence was substantively unreasonable because the District Court lost focus on the offender because of the appalling nature of the conduct and ignored his mental health issues.  This argument is based on our decision in *United States v. Olhovsky*, where the defendant was 18 years old when arrested and presented substantial expert testimony that he had a uniquely low chance of recidivism.  562 F.3d 530, 547-50 (3d Cir. 2009).  For example, the expert testified that the defendant, who had "subnormal social development," was succeeding in treatment and learning to engage in age-appropriate relationships.  *Id.* at 543, 549-51.  The

---

[13] We call it a "lesser crime" because at all relevant times the maximum sentence for King's crime of conviction was life imprisonment, 18 U.S.C. § 2241(c) (both before and after the 2006 amendment), whereas the maximum sentence for Larkin's crime of conviction was 30 years imprisonment.  18 U.S.C. § 2251 (amended in 2003 from 20 to 30 years).

37

district court in *Olhovsky* completely ignored that expert testimony, even erroneously finding that the defendant was *not* responding to treatment. *Id.* at 548. Furthermore, it committed procedural error by ignoring several § 3553(a) factors and focusing solely on "incapacitation, deterrence, and punishment." *Id.* at 547 & 550 n.18. Although it is true that we found Olhovsky's sentence substantively unreasonable, *id.* at 549-51, our decision must be read in light of the district court's procedural errors, which "necessarily raise questions about the substantive reasonableness of [the] sentence." *Id.* at 553.

We disagree that King's case is analogous to *Olhovsky*. Here, the District Court committed no procedural error and its descriptions of King's conduct as "almost nausea inducing" and "disturbingly serious" were not erroneous. Quite to the contrary, the District Court aptly described the nature of King's crime of conviction and relevant conduct. Accordingly, we will affirm King's sentence.[14]

---

[14] King also argues that the District Court erred by considering the subsequent statutory and Guidelines amendments during its § 3553(a) determination. Like our analysis regarding departures, it was within the District Court's discretion to consider subsequent amendments, without applying them, during its § 3553(a) determination. *See United States v. Goff*, 501 F.3d 250, 257 n.12 (3d Cir. 2007) (relying on a subsequent amendment to bolster its holding the District Court's sentence was unreasonable: the defendant's "sentence appears even more unreasonable when measured against the sentencing range provided in subsequent versions of the Sentencing

## VI.

For the foregoing reasons, we find no error in the District Court's decisions to deny King's motion to suppress or his motion to withdraw guilty plea. We also hold that the District Court's departure rulings were free of error and its application of the § 3553(a) factors were neither procedurally nor substantively unreasonable. We will therefore affirm the judgment of the District Court in all respects.

---

Guidelines").

FUENTES, *Circuit Judge*, concurring.

I concur with Judge Hardiman's well-crafted and thorough opinion. I agree with the majority's conclusion in Part III.A that the District Court properly denied King's motion to suppress the evidence found on the computer seized from his home. I write separately, however, because I believe that the seizure of King's computer hard drive was more properly justified on the well-settled ground of exigent circumstances and that the majority need not have adopted a new rule of constitutional law restricting *Georgia v. Randolph* to searches of the home. 547 U.S. 103, 122–23 (2006). In *Randolph*, the Supreme Court held that a present cotenant could refuse consent to a police search, regardless of the consent of a fellow occupant.

The exigent circumstances exception to the warrant requirement is well-established. *See, e.g.*, *Illinois v. McArthur*, 531 U.S. 326, 337 (2001) (Souter, J., concurring) (noting that the likelihood that property can be destroyed "in anticipation of a warrant exemplifies the kind of present risk that undergirds the accepted exigent circumstances exception to the general warrant requirement"); *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006); *accord Schmerber v. California*, 384 U.S. 757, 770–71 (1966). Importantly for this case, exigent circumstances include the prevention of the "imminent destruction of evidence." *Couden*, 446 F.3d at 496 (internal quotation marks & citation omitted); *accord Schmerber*, 384 U.S. at 770–71. In the context of the destruction of evidence, we have described the exigent circumstances inquiry as follows:

When Government agents . . . have probable

-1-

> cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified.

*United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973).

A review of the record in our case demonstrates that the seizure of the computer was clearly justified under the exigent circumstances exception. As the District Court found, "King would have possessed the opportunity to tamper with or dispose of the [computer] in the interim" before the officers retrieved a search warrant. (App. at 28.) This finding is reviewed for clear error. *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) (citation omitted). The officers possessed probable cause to believe that the computer contained evidence of a crime, namely images of child pornography. When Officer Kyle entered the trailer in Emporium, Pennsylvania, he recognized it as the location where the pornographic video of Larkin's daughter was made. McCullen told Kyle that when Larkin left, she took her daughter and her computer with her, giving the officers probable cause to believe that the computer contained evidence of child pornography and that it would be found at Larkin's residence. The officers could also reasonably conclude that the evidence on the computer would be destroyed or removed by King before they could return with a warrant. Computer-based evidence is readily tampered with, and, given Larkin's arrest, King had a motivation to destroy any incriminating evidence on the computer. Accordingly, the District Court's finding that King had the opportunity to tamper with the computer was not clear

-2-

error, and the warrantless seizure was justified based on exigency. I would affirm the denial of the suppression motion on this ground.

Rather than affirming the District Court on the basis of exigent circumstances, the majority adopts a narrow interpretation of *Randolph* that limits the Supreme Court's holding in that case to residences and does not include personal effects. I respectfully disagree with this approach. Prudential principles counsel in favor of deciding the instant case on the basis of well-established precedent rather than reaching a novel question of Fourth Amendment law. As we can uphold the seizure of the computer as necessary to prevent the destruction of evidence, I would do just that. Moreover, this approach would not substantially hinder law enforcement. The presence of an objecting co-owner is relevant to the determination of whether "the evidence will be destroyed or removed before [officers] can secure a search warrant." *Rubin*, 474 F.2d at 268. The Supreme Court noted as much in *Randolph*:

> Sometimes, of course, the very exchange of information . . . in front of the objecting inhabitant may render consent irrelevant by creating an exigency that justifies immediate action on the police's part; if the objecting tenant cannot be incapacitated from destroying easily disposable evidence during the time required to get a warrant, a fairly perceived need to act on the spot to preserve evidence may justify entry and search . . . .

547 U.S. at 117 n.6 (internal citations omitted). As anticipated

-3-

by the Supreme Court, King's presence in the home, his objection to the seizure, and the ease with which he could have tampered with the evidence created a "need to act on the spot" that justified the officers' actions.

Finally, I am concerned that the rule crafted by the majority has the potential to permit an encroachment on Fourth Amendment rights in circumstances in which society would recognize a reasonable expectation of privacy. *Randolph* instructs that "[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to widely shared social expectations." 547 U.S. at 111. I do not agree with the majority that, by sharing ownership in personal property, an individual who is present at the time that officers seek to search or seize that property has lost his or her right to refuse consent.

Take, for example, the situation in which two co-inhabitants share a footlocker inside their common residence. Both individuals have access to, and store items inside, the footlocker. For safekeeping and privacy purposes, one individual has placed inside of the footlocker photographs depicting him engaging in compromising, but legal, conduct. The police arrive at the shared residence, and the other co-inhabitant consents to the seizure of the footlocker and the search of its contents. The person depicted in the photographs objects, fearing that disclosure of the photographs could humiliate him and harm his reputation. Under the approach taken by the majority, by sharing the footlocker, he has forfeited his expectation of privacy in the photographs and his right to

shield them from view.[1]  An analogous scenario involving a shared *computer* on which one user has stored compromising *digital* photographs can be easily imagined.

The majority relies heavily on the principal dissenting opinion in *Randolph*, in which Chief Justice Roberts emphasized that "in cases of shared information, papers, containers, or places . . . privacy has been shared with another.  Our common social expectations may well be that the other person will not, in turn, share what we have shared with them with another—including the police—but that is the risk we take in sharing."  547 U.S. at 131.  Positing examples that appear to be directly applicable to the instant case, the Chief Justice concluded that by sharing a locker or a computer, one co-owner has given up his privacy with respect to the other and "assume[s] the risk that those who have access to and control over his shared property might consent to a search."  *Id.* at 134 (internal quotation marks omitted) (alteration in original).  As the *Randolph* majority clarified, however, the cases on which Chief Justice Roberts relied were inapposite in one key aspect—"the potential objector[ was] nearby but not invited to take part in the threshold colloquy."  *Id.* at 121.  Acknowledging that it was "drawing a fine line," the Court nonetheless held that "a *physically present* inhabitant's express refusal of consent to

<hr>

[1] The situation would be very similar with respect to a self-storage unit leased by two individuals, both of whom are present when police request consent to search the unit.  Keeping personal effects segregated in such a storage unit through the use of locks or other barriers would be impractical.

a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 121, 123 (emphasis added).

My colleagues further argue that, in writing for the Court, Justice Souter declined to expressly disagree with Chief Justice Roberts's approach as it applied to personalty; they cite this as evidence that the Court's intention was to restrict its holding to the home. As *Randolph* involved the search of a home, and not the search or seizure of personal effects, I hesitate to find such meaning in Justice Souter's silence, particularly where, under prudential principles, we should not be addressing the issue in the first instance.

As I discuss above, we need not resolve this constitutional issue of first impression to affirm the District Court's denial of King's suppression motion. Instead, I would simply hold that the warrantless seizure of the computer was justified based on the exigent need to prevent the destruction of evidence.